[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-12501

_____

D.C. Docket No. 0:10-cv-61839-JEM

LOUIS VUITTON MALLETIER, S.A.,
a foreign business entity,

Plaintiff-Appellee,

versus

JOSEPH MOSSERI,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 2, 2013)

Before HULL and MARTIN, Circuit Judges, and HINKLE,[*] District Judge.

HULL, Circuit Judge:

In this federal trademark infringement case, appellant Joseph Mosseri appeals the district court's denial of his motion under Federal Rule of Civil Procedure 60(b)(4) to vacate a default judgment entered against him. Appellant Mosseri does not contest that he was personally served with the lawsuit, that he received the motion for default judgment, and that he did not respond at all. Rather, over six months after service, Mosseri filed a Rule 60(b)(4) motion contending that the judgment is void because the district court in Florida lacked jurisdiction over his person. After careful review, and with the benefit of oral argument, we conclude that the district court did not commit reversible error in denying Mosseri's motion, and we affirm.

## I.  FACTS AND PROCEDURAL HISTORY

The plaintiff-appellee, Louis Vuitton Malletier, S.A. ("Louis Vuitton") sells high-end handbags and similar products. Louis Vuitton operates retail outlets and boutiques in the Southern District of Florida and elsewhere. Unauthorized websites advertised purported Louis Vuitton bags, including in Florida. The sample advertised price was $159. Louis Vuitton knew the bags were counterfeit

---

[*]Honorable Robert L. Hinkle, United States District Judge for the Northern District of Florida, sitting by designation.

2

but did not know who was selling them.  The procedural history shows how Louis Vuitton discovered defendant Joseph Mosseri was selling the counterfeit bags.

## A.    The Original Complaint Against Unidentified Defendants

In 2010, in the Southern District of Florida, Louis Vuitton filed a complaint against unidentified defendants who were operating websites under the domain names "pendoza.com" and "lazata.com."  Louis Vuitton's original complaint stated that Louis Vuitton manufactured and distributed throughout the world, including within the Southern District of Florida, high quality luggage, belts, handbags, and wallets under federally registered trademarks.  According to the original complaint, through the use of the "pendoza.com" and "lazata.com" websites, the unidentified defendants had sold counterfeit and trademark infringing luggage, belts, handbags, and wallets to consumers in the Southern District of Florida.

Louis Vuitton brought claims for trademark counterfeiting and infringement under 15 U.S.C. § 1114 and for false designation of origin under 15 U.S.C. § 1125(a).  Louis Vuitton requested: (1) a permanent injunction; (2) an order that the defendants' websites be permanently disabled; and (3) actual damages, trebled or statutory damages under 15 U.S.C. § 1117(c)(2) in the amount of $2,000,000 "per each counterfeit Louis Vuitton Mark used and product sold."

## B.    Expedited Discovery to Identify Website Operators

3

Louis Vuitton requested expedited discovery to identify the website operators.  Louis Vuitton filed an affidavit of Robert Holmes, a private investigator.  Holmes attested that, in February 2010, he purchased a counterfeit Louis Vuitton "cosmetic pouchette" from "lazata.com."  Holmes received this item in a package bearing a return address of "Pierre, LAZ Shipping, 1204 Ave U, Brooklyn, NY 11229."[1]  By exchanging electronic information with the website, Holmes identified: (1) the website's IP address as being issued by CSC Holdings, Inc.; and (2) HCI Fashion, Inc. of Brooklyn, New York as being the payee, although Holmes was unable to tell if this entity operated the website or was just a third party payment processor.  From New York corporate records, Holmes learned the incorporator of HCI Fashion was "Inna Orel" and HCI Fashion's address was 1204 Avenue U, Brooklyn, New York 11229.  An entity known as "Mail Drop Corp." owned that address.

The district court granted Louis Vuitton's requests to subpoena records from: (1) CSC Holdings; (2) Inna Orel; (3) Mail Drop Corp.; (4) United Parcel Service of America, Inc. ("UPS"); and (5) Verizon New York, Inc. ("Verizon").

Louis Vuitton also filed another affidavit from its investigator Holmes describing a second Internet purchase.  In October 2010, Holmes purchased a Louis Vuitton branded canvas billfold from the "pendoza.com." website.  UPS

---

[1]Louis Vuitton does not argue that Holmes purchased or received the item in Florida.

delivered the billfold to Holmes in Wilton Manors, Florida, and the payee information he received included a Verizon telephone number, which was (718) 332-0085.  As discussed later, Verizon records showed who owned that number. The package had the same return address as the one on the package received after Holmes's February 2010 purchase from "lazata.com."

## C.     The First Amended Complaint Against Chera and Zakmo Corporation

Through this expedited discovery, Louis Vuitton initially concluded that the operator of "lazata.com" and "pendoza.com" was Raymond V. Chera, who was affiliated with Zakmo Corporation.  Louis Vuitton identified Chera based on Mail Drop Corp. records showing that Chera rented the mailbox registered to HCI Fashion.  Louis Vuitton amended its complaint to name "Raymond V. Chera" and "Zakmo Corp." as defendants.

## D.     Further Investigation and Identification of Defendant Joseph Mosseri

Louis Vuitton also received records from Verizon.  The Verizon documents showed that JEM Marketing, Inc. ("JEM Marketing"), a corporation with the address 2167 East 21st Street, Brooklyn, New York, 11229, owned the phone number—(718) 332-0085—associated with "pendoza.com" and the payee in the billfold purchase.  Verizon identified (718) 332-0085 as a land line number for JEM Marketing.

5

The Verizon records also showed that a second number—(917) 669-2544—was associated with this JEM Marketing account.  Another Louis Vuitton investigator, Linda Kadluboski, testified that this second phone number—(917) 669-2594—was listed "to Joseph Mosseri at 2167 East 21st Street in Brooklyn, New York."

Chera's attorney contacted Louis Vuitton's attorney and admitted that Chera had rented a mailbox for the purposes of sending goods marketed on the "pendoza.com" and "lazata.com" websites.  However, Chera's attorney stated that Chera had done so on behalf of another person, Joseph Mosseri.  Chera's attorney provided Louis Vuitton with Mosseri's personal cellular telephone number of (917) 669-2544, which was the same as the second number associated with JEM Marketing's Verizon account.

Louis Vuitton then obtained New York state records showing JEM Marketing's "Chairman or Chief Executive Officer" was Joseph Mosseri.  In sum, Louis Vuitton's investigation revealed that the payee JEM Marketing and its CEO Mosseri were using the same phone number—(917) 669-2544—and same address—2167 East 21st Street, Brooklyn, New York.

### E.    The Second Amended Complaint Against Joseph Mosseri

Having concluded that it was Mosseri, not Chera, who was actually behind the websites "pendoza.com" and "lazata.com," Louis Vuitton dismissed Chera as a

6

defendant and filed a motion for leave to file a second amended complaint (the "complaint") adding Mosseri as a defendant. The district court granted the motion, and Louis Vuitton filed the complaint against Mosseri.

The complaint repeated the same factual allegations and claims as those in the original complaint. Louis Vuitton also alleged that defendant Mosseri engaged in the above-described illegal counterfeiting and infringing activities knowingly and intentionally or with reckless disregard or willful blindness to Louis Vuitton's rights.

This time, the complaint included new allegations relevant to jurisdiction over Mosseri. For example, Louis Vuitton's complaint alleged that the district court may "properly exercise personal jurisdiction over Defendants since all Defendants directly target business activities towards consumers in Florida and cause harm to Louis Vuitton's business within this District through at least the fully interactive Internet websites operating under the Subject Domain Names." The complaint defined "Subject Domain Names" to include "lazata.com" and "pendoza.com."

The complaint also alleged that Mosseri resides in New York but "conducts business throughout the United States, including within this Judicial District, through the operation of the fully interactive commercial websites operating under the Subject Domain Names."

7

Moreover, the complaint alleged that "Defendants <u>engage in the</u> offering for sale and <u>sale of counterfeit and infringing Louis Vuitton branded products within this Judicial District</u> through multiple fully interactive commercial websites operating under at least the Subject Domain Names" and "have purposefully directed their illegal activities towards consumers in . . . Florida through the advertisement, offer to sell and <u>sale of counterfeit</u> . . . <u>goods into the State</u>."  In another paragraph, the complaint stated that Louis Vuitton had determined that Mosseri and his co-defendants "<u>are</u> promoting and otherwise advertising, distributing, <u>selling</u> and/or offering for sale <u>counterfeit products</u>, including at least handbags and wallets, using trademarks which are exact copies of the Louis Vuitton Marks (the 'Counterfeit Goods')."  Later in the complaint, Louis Vuitton reiterated that Mosseri was conducting "counterfeiting and infringing activities and causing harm at least within this Judicial District and elsewhere throughout the United States."

The complaint added that the defendants' counterfeit goods "are of a quality substantially different than that of Louis Vuitton's genuine goods.  Despite the nature of their Counterfeit Goods and the knowledge they are without authority to do so, Defendants are actively using, promoting and otherwise advertising, distributing, selling and/or offering for sale substantial quantities of their

8

Counterfeit Goods with the knowledge that such goods will be mistaken for the genuine high quality products offered for sale by Louis Vuitton."

### F.    Mosseri's Failure to Respond

A summons was issued for Mosseri on May 16, 2011 and returned executed on May 24, 2011. The process server's affidavit averred that, on May 19, 2011 at 8:57 PM at Mosseri's Brooklyn, New York address, he served the complaint and a summons on Mosseri. The complaint, served on Mosseri, was signed by Louis Vuitton's retained attorney in Florida, Stephen M. Gaffigan.

Mosseri did not respond to the complaint. On June 8, 2011, Louis Vuitton's attorney, Gaffigan, received a telephone call from David Schrader, who stated that he was a potential counsel for Mosseri and acknowledged that a response to the complaint was due June 9. Schrader informed Gaffigan that Mosseri needed a two-week extension until June 23 to respond to the complaint, to which Gaffigan agreed. However, Schrader never entered an appearance as counsel, and Mosseri never filed for an extension nor answered the complaint.

As a result, on June 27, 2011, the clerk of the district court in Florida signed an order stating that Mosseri was in default for failure to answer or otherwise plead to the complaint against him. See Fed. R. Civ. P. 55(a) ("When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the

9

party's default.").  The clerk of the district court mailed a copy of the default to Mosseri in New York.

## G.    Louis Vuitton's Motion for Default Judgment

On August 1, 2011, Louis Vuitton filed its motion for a default judgment and attached supporting evidence.  See Fed. R. Civ. P. 55(b)(2).  Louis Vuitton requested: (1) a default judgment and a permanent injunction; (2) orders requiring the domain names of the websites "lazata.com" and "pendoza.com" be made inoperable; (3) $324,000.00 in statutory damages under 15 U.S.C. § 1117(c); (4) $9,135.00 in attorney's fees under 15 U.S.C. § 1117(a)–(b); (5) $2,567.50 in investigative fees under 15 U.S.C. § 1117(a); (6) $504.10 in costs; and (6) prejudgment interest.

As to statutory damages, Louis Vuitton relied on 15 U.S.C. § 1117(c), which provides that a plaintiff may elect to recover, instead of actual damages and profits, an award of statutory damages of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed."  15 U.S.C. § 1117(c).  When the court determines that the trademark violation was "willful," the statute authorizes statutory damages of "not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed."  Id. at § 1117(c)(2).

In addition, Louis Vuitton claimed that: (1) Mosseri's infringing activities were willful; (2) Mosseri had sold two types of goods—handbags and wallets; and (3) these goods bore nine different federally registered Louis Vuitton trademarks. Louis Vuitton asked the district court to "start with the baseline statutory minimum award of $3,000.00, treble it to reflect Defendant's willfulness, and then double the product for the purpose of deterrence."[2]  Louis Vuitton stated that "[t]he result would be $18,000.00 per registered Louis Vuitton Mark counterfeited (9) per type of goods sold (2) for a total award amount of $324,000.00 in statutory damages."

Louis Vuitton's evidence included, inter alia: (1) an affidavit by Louis Vuitton's in-house counsel, Nikolay Livadkin, discussing its trademarks and how the goods purchased from the websites "were non-genuine Louis Vuitton products"; (2) copies of the Louis Vuitton registered trademarks; (3) another affidavit from investigator Holmes summarizing his 2010 purchases, explaining how those purchases led him to Mosseri, and reporting his investigation cost $2,567.50; (4) images captured from the websites; (5) receipts and shipping documents from Holmes's purchases; (6) pictures of Holmes's purchases; (7) the New York state record on JEM Marketing; (8) an affidavit by Louis Vuitton's

[2]Louis Vuitton did not cite any authority for its position that $3,000 was the "baseline statutory minimum award."  In fact, the statute says otherwise, making the baseline minimum award $1,000.  15 U.S.C. § 1117(c).  Nevertheless, the district court did not acknowledge this discrepancy, and Mosseri does not appeal it here.

11

attorney, Gaffigan, explaining the amount of costs and attorneys' fees requested; (9) the Verizon records; (10) the process service firm's receipt [; and (11) copies of the subpoenas to record providers.[3]

## H.    Default Judgment

Mosseri does not now dispute the fact that he received but did not respond to Louis Vuitton's August 11 motion for a default judgment.  On August 31, 2011, the district court entered a default judgment against Mosseri.

In the default judgment, the district court issued a permanent injunction restraining defendant Mosseri from, inter alia: (1) "manufacturing or causing to be manufactured, importing, advertising, or promoting, distributing, selling or offering to sell counterfeit and infringing goods using" the Louis Vuitton trademarks listed in the complaint; (2) using Louis Vuitton's trademarks "in connection with the sale of any unauthorized goods"; (3) "using any logo, and/or layout which may be calculated to falsely advertise" Mosseri's services or products "as being sponsored by, authorized by, endorsed by, or in any way associated with" Louis Vuitton; (4) "falsely representing" himself as being associated with Louis Vuitton; (5) creating new entities to circumvent the district court's injunction; and (6) using Louis Vuitton trademarks on the Internet.  The district

---

[3]At the same time it filed its default judgment motion against Mosseri, Louis Vuitton voluntarily dismissed with prejudice its claims against Zakmo Corp. and all John Doe defendants.

12

court ordered that the websites at issue be transferred to Louis Vuitton's control and that various Internet administrative entities give effect to the transfer.

The district court awarded this monetary relief against Mosseri: (1) $324,000.00 in statutory damages; (2) $9,135.00 in attorney's fees; (3) $2,567.50 in investigative fees; (4) $504.10 in costs; and (5) prejudgment interest. Louis Vuitton's attorney Gaffigan personally sent a copy of the final default judgment to Mosseri via email. Gaffigan also sent a copy to Mosseri by regular mail.

## I.    Mosseri's Motion to Vacate the Default Judgment

More than six months after being served with the complaint and more than three months after the default judgment, defendant Mosseri, through Florida counsel, filed a motion to vacate the default judgment under Rule 60(b)(4) and attached Mosseri's affidavit.[4] Mosseri's motion, filed on December 13, 2011, argued that the default judgment should be vacated because: (1) he was never served; and (2) the district court in Florida lacked personal jurisdiction over him.

In his half-page affidavit, Mosseri stated in full:

> 1.    I was never served with a copy of the Florida lawsuit. I found out about the lawsuit after searching for my name on the internet. I have blondish hair, weigh about 195 pounds and am about 6'2" tall.

---

[4]Mosseri labeled his filing a "verified motion," but there was no verification as to the allegations in the motion. Rather, Mosseri filed an unsworn "Declaration" under 28 U.S.C. § 1746(2) which is treated as evidence under that section. For ease of reference, we refer to this as Mosseri's affidavit.

2.    I reside in New York, not Florida.  I do not conduct any business in Florida.

3.    I am not affiliated with the websites lazata.com, pendoza.com,  besela.com,  bessella.com,  besella.com  or bonntique.com.

Despite this affidavit saying he was not served, Mosseri ultimately withdrew that claim.  Notably too, Mosseri's motion and affidavit did not deny, much less rebut, the complaint's detailed allegations that substantial quantities of counterfeit Louis Vuitton goods and products were being sold through the "pendoza.com" and "lazata.com" websites including to Florida consumers.  Instead, Mosseri's contention was he was "not affiliated" with those websites.

## J.    Louis Vuitton's Response to the Motion to Vacate

On December 30, 2011, Louis Vuitton responded to Mosseri's motion to vacate and filed affidavits from the process server and investigators Holmes and Kadluboski.  Investigator Kadluboski's affidavit indicated that the telephone number provided by Chera—(917) 669-2544—belonged to Mosseri.  Holmes's affidavits were the earlier ones recounting his two 2010 purchases and how his investigation and subpoenaed records had led him to Mosseri.

Louis Vuitton emphasized the record already established that Mosseri was in fact served.  Nevertheless, in a second affidavit, the process server again averred that he personally served process on Mosseri and added that the individual served identified himself as "Joseph Mosseri."  The process server's affidavit stated that

14

the individual served identified himself as Joseph Mosseri. Louis Vuitton stressed

that an individual claiming to represent Mosseri contacted Louis Vuitton's attorney

on June 8, 2011 requesting an extension of time to answer the complaint. Louis

Vuitton reasoned that it was "odd that a man who claims he was never served . . .

somehow managed to have counsel contact Louis Vuitton's counsel the day before

his answer to the . . . Complaint was due and request an extension."[5]

As to jurisdiction, Louis Vuitton asserted that personal jurisdiction existed

over Mosseri under Florida's long-arm statute because Mosseri committed tortious

acts—trademark infringement—in Florida. The tortious acts in Florida were: (1)

Mosseri's operation of "fully-interactive Internet websites" on which Florida

customers could view, buy, and pay for products bearing counterfeits of the Louis

Vuitton trademarks; and (2) the fact that "Mosseri, through his affiliated websites,"

actually sold and shipped counterfeit Louis Vuitton goods into the Southern

District of Florida.

## K.    District Court Evidentiary Hearing on Motion to Vacate

The district court set an evidentiary hearing for January 26, 2012, which was

continued to February 28. Five days before that date, the parties filed a joint

motion to cancel the evidentiary hearing and stated that Mosseri was dropping his

---

[5]In his reply in support of his motion to vacate, Mosseri, through Florida counsel, Matthew Sarelson, conceded that it was true Mosseri's earlier attorney in New York had contacted Louis Vuitton's attorney about an extension.

15

argument about having never been served.  The district court scheduled a new evidentiary hearing for March 16.  Four days before the hearing, Mosseri's Florida attorney, Sarleson, who had filed the motion papers and affidavit, withdrew and the hearing was continued again.

The district court held the evidentiary hearing on March 30.  Mosseri's new attorney, Santucci, came to the hearing, but Mosseri did not.  Mosseri's attorney did not offer any evidence.  Louis Vuitton called two witnesses: investigators Holmes and Kadluboski.  As noted above, Mosseri's affidavit had not denied the complaint's allegations that counterfeit Louis Vuitton goods and products were being sold through the websites to consumers in Florida.  The focus of the hearing was whether Mosseri was connected to the websites.

Holmes testified that Louis Vuitton retained his firm to investigate the websites "pendoza.com" and "lazata.com."  He logged on to the Internet via a proxy server located in Florida and accessed "pendoza.com."  Afterwards, he "interacted with the website" by "click[ing] on specific buttons for clients trademarks, items that bore our clients trademarks and retriev[ing] data with items with those trademarks on them."  Holmes selected goods bearing Louis Vuitton trademarks and actually ordered an item from the website "pendoza.com."  Holmes received the item at his firm's address in Wilton Manors, Florida.  Holmes recounted the investigation after his purchase.  Specifically, his: (1) receiving a

telephone number—(713) 322-0085—linked to the payee on the Florida transaction; (2) linking the telephone number—(713) 322-0085—to JEM Marketing; and (3) reviewing New York records to determine that Joseph Mosseri is the CEO of JEM Marketing.[6]

Mosseri's attorney asked whether Holmes "received any e-mail or letter directly from Joseph Mosseri." Holmes responded that he had "received an e-mail from the website confirming [his] order" and that he could not "tell you sitting here that Joseph Mosseri was or was not the person that pressed the button on that particular e-mail." Mosseri's attorney asked whether Holmes uncovered evidence "of any sort that Joseph Mosseri knew about the Wilton Manors[, Florida] transaction." In response, Holmes pointed out that his firm "paid Mr. Mosseri."

Next, investigator Kadluboski testified that Louis Vuitton hired her to conduct a background investigation on Mosseri. Kadluboski was previously a federal agent with the U.S. Customs Service and Department of Homeland Security for 25 years. As a result of her investigation, she "was able to associate" Mosseri with the telephone number of (917) 669-2544. She testified that the number (917) 669-2544 was "listed to Joseph Mosseri at 2167 East 21st Street in

---

[6]During cross-examination by Mosseri's attorney, Holmes testified he had "been investigating Joseph Mosseri for eight years" and he did "not recall how many purchases that Joseph Mosseri shipped to us in Florida." Although Holmes could not recall other specific transactions linking Mosseri to Florida, he testified that he "would be able to identify other transactions if I were able to look through my records."

Brooklyn, New York."  As the Verizon records showed, that same phone number and same address are also shown on the Verizon account of JEM Marketing. During cross-examination, Kadluboski noted that her investigation did not reveal that Mosseri had any addresses in Florida.

After these two witnesses testified, the district court heard arguments from Mosseri's attorney.  When the district court inquired as to why Mosseri's selling a good directly into Florida was not enough for personal jurisdiction, Mosseri's attorney stressed that Louis Vuitton manufactured the sale by directing its investigator to order the product and have it shipped to him in Florida.

The district court made certain legal conclusions.  The district court stated "it would seem to me that if there is a sale to somewhere in the world, there's jurisdiction" in that place (i.e., where the good was sold and delivered).  The district court rejected Mosseri's "manufactured sale" argument, pointing out that the only way to determine whether a good offered for sale on the Internet was genuine or counterfeit was for Louis Vuitton to order and obtain the good.  The district court commented that "how they get it, I don't think that matters."

Next, the district court made certain findings.  It concluded that the evidence showed Holmes ordered and received a counterfeit Louis Vuitton billfold in Florida, stating "they ordered it, they got it, it was delivered to them here, in the Southern District of Florida."  The district court found that Mosseri, through his

18

website, was "soliciting business wherever the Internet goes" including in Florida. It found that Holmes had ordered and received in Wilton Manors, Florida "the bag," and paid "a company that is controlled by Mr. Mosseri." The district court stated that, unless Mosseri had "a factual defense saying, you know, Mosseri was in a coma for several months and did not know what was going on . . . [,] his corporation [was] getting the money for selling what is allegedly infringing goods."

The district court orally denied Mosseri's motion to vacate. After Mosseri's attorney stated that Louis Vuitton had not "met [the] burden" of "show[ing] a continuous and systematic contact with the state of Florida," the district court reiterated "I find they have done that."

The district court followed this oral order with a short written order providing: "[f]or the reasons set forth on the record, it is hereby: ORDERED AND ADJUDGED that Joseph Mosseri's Verified Motion to Vacate Default Judgment . . . is DENIED." Mosseri timely appealed, contending the default judgment is void because the district court in Florida lacked personal jurisdiction over him.

## II.  STANDARD OF REVIEW

A plaintiff seeking to establish personal jurisdiction over a nonresident defendant "bears the initial burden of alleging in the complaint sufficient facts to

make out a prima facie case of jurisdiction." United Techs. Corp. v. Mazer, 556

F.3d 1260, 1274 (11th Cir. 2009).  When a defendant challenges personal

jurisdiction "by submitting affidavit evidence in support of its position, the burden

traditionally shifts back to the plaintiff to produce evidence supporting

jurisdiction."  Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir. 1990) (internal

quotation marks omitted).  The burden, however, does not shift back to the plaintiff

when "the defendant's affidavits contain only conclusory assertions that the

defendant is not subject to jurisdiction."  Stubbs v. Wyndham Nassau Resort &

Crystal Palace Casino, 447 F.3d 1357, 1360 (11th Cir. 2006).

We review de novo whether the district court had personal jurisdiction over

a nonresident defendant.  Oldfield v. Pueblo De Bahia Lora, S.A., 558 F.3d 1210,

1217 (11th Cir. 2009).  In doing so, we accept as true the allegations in the

complaint.  Stubbs, 447 F.3d at 1360.  If the district court makes any findings of

fact in reaching its personal jurisdiction conclusion, we review those fact findings

for clear error.  Merial Ltd. v. Cipla Ltd., 681 F.3d 1283, 1292 (11th Cir. 2012).

We generally review a district court's denial of a Rule 60(b) motion to

vacate a default judgment under a deferential abuse of discretion standard.

Oldfield, 558 F.3d at 1217.  However, when a party seeks to vacate a default

judgment by arguing that the district court did not have jurisdiction over his

20

person, we review de novo the denial of the Rule 60(b) motion because "a district court's failure to vacate a void judgment is per se an abuse of discretion." Id.

## III.  PERSONAL JURISDICTION QUESTIONS

We consider two questions in resolving personal jurisdiction: (1) whether personal jurisdiction exists over the nonresident defendant Mosseri under Florida's long-arm statute, and (2) if so, whether that exercise of jurisdiction would violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. See Mut. Serv. Ins. Co. v. Frit Indus., Inc., 358 F.3d 1312, 1319 (11th Cir. 2004).

Before evaluating these legal issues, we address Mosseri's affidavit because a key factual issue here was whether Mosseri was connected to the websites that were selling counterfeit Louis Vuitton goods.

## IV.  MOSSERI'S AFFIDAVIT

Mosseri claims that his affidavit means the district court clearly erred in its finding that he was involved with the "pendoza.com" website that was selling counterfeit goods into Florida and wherever the Internet goes.  We disagree and explain why.

We start with the allegations in Louis Vuitton's complaint and then review what Mosseri's affidavit said.  Louis Vuitton's complaint specifically alleged that Mosseri: (1) "conducts business throughout the United States, including within this Judicial District"; (2) engaged in the "sale of counterfeit and infringing Louis

21

Vuitton branded products within this Judicial District through multiple fully interactive commercial websites"; (3) purposefully directed illegal activities "towards consumers in . . . Florida through the . . . sale of counterfeit Louis Vuitton branded goods into the State"; (4) was "selling and/or offering for sale counterfeit products, including at least handbags and wallets, using trademarks which are exact copies of the Louis Vuitton Marks"; and (5) was "actively . . . advertising, distributing, selling . . . substantial quantities" of these infringing goods in Florida and elsewhere.  These allegations established a prima facie case of jurisdiction over Mosseri.  See Posner v. Essex Ins. Co., 178 F.3d 1209, 1216 (11th Cir. 1999) (holding that the plaintiff "alleged facts, unrebutted by Salem, that established a prima facie case of jurisdiction over Salem").

To shift the burden back to the plaintiff, a defendant's affidavit must contain "specific factual declarations within the affiant's personal knowledge."  Id. at 1215.  As noted earlier, Mosseri's affidavit did not deny that counterfeit Louis Vuitton goods and products were being sold directly to Florida consumers through the "pendoza.com" website.  Instead, Mosseri's affidavit contains only a denial that he was not affiliated with the website.  Given the extensive allegations in the complaint, it is questionable whether Mosseri's conclusory denial shifted the burden back to the plaintiff at all.  See id. (concluding that a nonresident defendant's attempt to challenge a prima facie case of personal jurisdiction with

22

"conclusory assertions of ultimate fact" is insufficient to shift to the plaintiff "the burden of producing evidence supporting jurisdiction").

In any event, for purposes of this appeal, we accept that Mosseri's affidavit created a factual issue as to whether he was affiliated with the "pendoza.com" website (which was selling infringing goods into Florida). The problem for Mosseri is that the district court held an evidentiary hearing and found that Holmes had ordered through Mosseri's website, had received in Florida, and had paid Mosseri's company for the infringing billfold. The district court also found Mosseri was soliciting business through his website wherever the Internet goes, including in Florida and that his company was getting money for selling infringing goods. The documentary evidence and investigators' testimony support those findings, and Mosseri has not shown the district court clearly erred in making them.

The fact that the district court did not believe Mosseri's affidavit is not surprising. In the first paragraph, Mosseri stated he was never served with process. The record established that Mosseri was personally served. Mosseri finally stopped denying this. In the third paragraph, Mosseri said he was not "affiliated" with the "pendoza.com" website. But Louis Vuitton's evidence at the hearing demonstrated the contrary. Holmes paid JEM Marketing for the billfold ordered through the "pendoza.com" website, and Mosseri was the CEO of JEM Marketing.

If Mosseri was not the entire moving force behind the "pendoza.com" website, he surely had the lead role. If Mosseri's company, JEM Marketing, had even one other employee besides its CEO Mosseri, the record did not reflect it.

In the second paragraph, Mosseri swore he lived in New York. That was true. Mosseri added only: "I do not conduct any business in Florida." If this was meant as a statement that his "pendoza.com" website produced no sales to Florida, the statement was demonstrably false. The investigators' affidavits, testimony, and subpoenaed records collectively revealed that the payee JEM Marketing and its CEO Mosseri were using the same telephone number ((917) 669-2544) and same address (2167 East 21st Street, Brooklyn, New York). As the district court found, the payee, JEM Marketing sent the billfold to Holmes in Florida, which he ordered through the "pendoza.com" website, and Mosseri controlled JEM Marketing. This evidence indicated the falsity of the statement that Mosseri did not conduct "any business in Florida."

That the district court did not credit the statements in Mosseri's affidavit—that he was not affiliated with the websites and did not conduct business in Florida—was not clear error. Given that determination, we must now review whether the complaint's unrebutted allegations and investigators' testimony showed that Mosseri was subject to personal jurisdiction in Florida. We thus turn to Florida's long-arm statute.

## V.  FLORIDA'S LONG-ARM STATUTE

The reach of Florida's long-arm statute "is a question of Florida law," and this Court is required to apply the statute "as would the Florida Supreme Court." United Techs., 556 F.3d at 1274.  We are also bound to adhere to the interpretations of Florida's long-arm statute offered by Florida's District Courts of Appeal absent some indication that the Florida Supreme Court would hold otherwise.  Id.  "Florida's long-arm statute is to be strictly construed." Sculptchair, Inc. v. Century Arts, Ltd., 94 F.3d 623, 627 (11th Cir. 1996) (applying Florida law).

### A.     Fla. Stat. § 48.193(1)(a)(2)

Florida's long-arm statute provides for both general and specific personal jurisdiction.  See Fla. Stat. § 48.193(1)–(2).  General personal jurisdiction exists when a defendant "is engaged in substantial and not isolated activity within this state . . . whether or not the claim arises from that activity."  Id. § 48.193(2). General personal jurisdiction is based on a defendant's substantial activity in Florida without regard to where the cause of action arose.  See Oldfield, 558 F.3d at 1220 n.27.

On the other hand, specific personal jurisdiction authorizes jurisdiction over causes of action arising from or related to the defendant's actions within Florida and concerns a nonresident defendant's contacts with Florida only as those

contacts related to the plaintiff's cause of action.  See id.  Louis Vuitton relies on the "tortious acts within Florida" provision in § 48.193(1)(a)(2) of Florida's long-arm statute.

Section 48.193(1)(a)(2) provides that a nonresident defendant is subject to personal jurisdiction in Florida "for any cause of action arising from . . . [c]ommitting a tortious act within [Florida]."  Fla. Stat. § 48.193(1)(a)(2) (emphasis added).  Accordingly, Louis Vuitton must show its trademark infringement claims arose from Mosseri committing "a tortious act within" Florida.  Similar to Louis Vuitton's case, our precedent in Licciardello v. Lovelady, 544 F.3d 1280 (11th Cir. 2008), involved a website-trademark infringement claim against a nonresident defendant and Florida's same "tortious act" provision—§ 48.193(1)(a)(2).  Thus, Lovelady guides our analysis here.

In Lovelady, the plaintiff, Licciardello, a nationally-known entertainer, sued defendant Lovelady, his former personal manager in the Middle District of Florida. Id. at 1282–83.  Licciardello alleged that Lovelady had wrongfully used Licciardello's trademarked name and picture on Lovelady's Internet website "accessible to the public in Florida that promoted Lovelady as a personal manager for music artists."  Id. at 1282 (emphasis added).  Defendant Lovelady lived in Tennessee, created his website in Tennessee, and moved to dismiss for lack of

personal jurisdiction over him in Florida.  Id. at 1282–83.  The district court granted the motion for lack of jurisdiction over defendant Lovelady in Florida.  Id.

Reversing, this Court concluded that the plaintiff's allegations in the complaint were sufficient to establish personal jurisdiction in Florida over defendant Lovelady under the "tortious acts" provision in § 48.193(1)(a)(2).  Id. at 1283–84.[7]  While Lovelady did not expressly analyze whether trademark infringement claims are tort claims, Lovelady treated them as tortious acts.  Id.[8] Thus, we conclude that Louis Vuitton's trademark claims allege "tortious acts" for purposes of Florida's long-arm statute.

More importantly, Lovelady also tells us that, under Florida law, a nonresident defendant commits "a tortious act within [Florida]" when he commits an act outside the state that causes injury within Florida.  See id. at 1283 (citing Posner, 178 F.3d at 1216–17 (collecting Florida cases and adopting Florida courts' broad interpretation of the long-arm statute that permits personal jurisdiction over

---

[7]Lovelady construed a previous version of the statute, where the tortious acts provision was codified at Fla. Stat. § 48.193(1)(b).  In 2013, the Florida legislature amended the statute and moved the tortious acts provision to its present location at Fla. Stat. § 48.193(1)(a)(2).  However, the amendment did not alter the language of the provision or change its substance in any way.

[8]Other courts describe trademark infringement as a tort.  See, e.g., Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 171 (2d Cir. 2010) ("Trademark infringement is . . . a tort."); Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 720 (9th Cir. 2004) ("[T]rademark infringement generally sounds in tort."); Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1388 (8th Cir. 1991) ("Infringement of a trademark is a tort.").

nonresident "defendants committing tortious acts outside the state that cause injury in Florida")).[9]

Furthermore, Lovelady instructs that, under the "tortious acts" provision in § 48.193(1)(a)(2), a trademark infringement on an Internet website causes injury and occurs in Florida "by virtue of the website's accessibility in Florida." Lovelady, 544 F.3d at 1283.  Although defendant Lovelady lived and created the website containing the infringing mark in Tennessee, the owner of the mark (plaintiff Licciardello) resided in Florida.  Id. at 1282–83.  We reasoned that "[w]e need not decide whether trademark injury necessarily occurs where the owner of the mark resides, as the Florida district courts have held, because in this case the alleged infringement clearly also occurred in Florida by virtue of the website's accessibility in Florida."  Id. 1283 (emphasis added).

Applying our precedent in Lovelady, we conclude that under Florida law where Mosseri created the websites and posted the alleged infringing material does not matter.  For purposes of § 48.193(1)(a)(2), the issue is whether Mosseri's tortious acts caused injury in Florida.  Lovelady says the tort of trademark infringement caused injury and thus "occurred in Florida by virtue of the website's accessibility in Florida."  Id.

---

[9]The Florida Supreme Court has, without expressly adopting or rejecting it, acknowledged this Court's interpretation.  See Internet Solutions Corp. v. Marshall, 39 So. 3d 1201 (Fla. 2010) (recognizing that federal courts have held "that the commission of a tortious act out of state that causes injury to an in-state resident satisfies Florida's long-arm statute").

28

Although <u>Lovelady</u> relied on the website's <u>accessibility</u> in Florida for its long-arm statute analysis solely, this case involves other tortious acts within Florida. Louis Vuitton's complaint repeatedly alleged that Mosseri was selling counterfeit and infringing Louis Vuitton products and goods into the Southern District of Florida and elsewhere and also alleged "substantial quantities" were being sold. Mosseri never rebutted these allegations of multiple sales into Florida. Louis Vuitton even introduced evidence of a sample sale from the "pendoza.com" website to Holmes, located in Florida. Mosseri did not dispute that this Florida sale happened through that website; he only contested his association with the payee on the website transaction, JEM Marketing. However, the district court expressly found that Mosseri controlled that payee company and was soliciting business through that website.

In summary, Mosseri's tortious acts on behalf of JEM Marketing caused injury in Florida and thus occurred there because Mosseri's trademark infringing goods were not only accessible on the website, but were sold to Florida customers through that website. This satisfies § 48.193(1)(a)(2)'s requirements for specific personal jurisdiction over Mosseri.

## B.    Mosseri's Corporate Shield Defense

On appeal, Mosseri argues for the first time that he is not subject to personal jurisdiction in Florida because any websites sales and infringement acts by him

were made on behalf of his corporation, JEM Marketing.  First, Mosseri did not raise this corporate shield argument in his Rule 60(b)(4) motion to vacate or during the district court's evidentiary hearing.  Thus, we consider this argument waived. See Miller v. King, 449 F.3d 1149, 1150 n.1 (11th Cir. 2006) (holding that because a "claim was never raised in the district court" this Court would "not consider it for the first time on appeal"); Narey v. Dean, 32 F.3d 1521, 1526–27 (11th Cir. 1994) ("[A]ppellate courts generally will not consider an issue or theory that was not raised in the district court." (internal quotation marks omitted)).

In any event, even if the argument is not waived, this case involves intentional torts, meaning that Mosseri cannot invoke Florida's corporate shield doctrine.  For purposes of personal jurisdiction under Florida law, the corporate shield doctrine creates a "distinction between a corporate officer acting on one's own and a corporate officer acting on behalf of one's corporation."  Doe v. Thompson, 620 So. 2d 1004, 1006 (Fla. 1993).  Florida courts have held "that it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer."  Id. (internal quotation marks omitted).

Importantly, however, under Florida law, this corporate shield doctrine is inapplicable where the corporate officer commits intentional torts.  Id. at 1006 n.1 (stating "[a] corporate officer committing fraud or other intentional misconduct can

30

be subject to personal jurisdiction"); see also Kitroser v. Hurt, 85 So. 3d 1084, 1088 n.3 (Fla. 2012). Because Louis Vuitton alleges that Mosseri committed intentional torts, his corporate shield defense to personal jurisdiction fails under Florida law.

## VI.  THE DUE PROCESS CLAUSE

Alternatively, Mosseri argues the district court's exercise of specific personal jurisdiction over him violated due process.

### A.    Three-Part Due Process Test

In specific personal jurisdiction cases, we apply the three-part due process test, which examines: (1) whether the plaintiff's claims "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant "purposefully availed" himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice."  See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472–73, 474–75, 105 S. Ct. 2174, 2182–83 (1985); Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 413–14, 104 S. Ct. 1868, 1872 (1984); Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945); see

31

also Oldfield, 558 F.3d at 1220–21; Sculptchair, Inc. v. Century Arts, Ltd., 94 F.3d 623, 630–31 (11th Cir. 1996).[10]

The plaintiff bears the burden of establishing the first two prongs, and if the plaintiff does so, "a defendant must make a 'compelling case' that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc., 593 F.3d 1249, 1267 (11th Cir. 2010).

## B.    Prong One: "Arising Out of" or Relatedness

"[A] fundamental element of the specific jurisdiction calculus is that plaintiff's claim must arise out of or relate to at least one of the defendant's contacts with the forum.'" Fraser v. Smith, 594 F.3d 842, 850 (11th Cir. 2010) (quoting Oldfield, 558 F.3d at 1222 (additional internal quotation marks omitted)). "Our inquiry must focus on the direct causal relationship between the defendant, the forum, and the litigation." Fraser, 594 F.3d at 850 (internal quotation marks omitted) (quoting Helicopteros, 466 U.S. at 414, 104 S. Ct. at1872). "[A] relationship among the defendant, the forum, and the litigation is the essential

---

[10]We recognize the existence of the sliding-scale test for Internet cases first articulated in Zippo Manufacturing Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W. D. Pa. 1997). But our Court has noted scholarly criticisms of the Zippo test. See Oldfield, 558 F.3d at 1219–20 n.26. We conclude the traditional, three-prong test works just fine in this Internet case where the website was commercial and fully interactive.

foundation of in personum jurisdiction . . . ."  Helicopteros, 466 U.S. at 414, 104 S.

Ct. at 1872 (internal quotation marks omitted).

Here, Louis Vuitton's trademark claims arise out of Mosseri's contacts with

Florida.  Mosseri's ties to Florida all involve the advertising, selling, and

distributing of alleged counterfeit and infringing Louis Vuitton goods into the state

and accepting payment from Florida customers for such goods.  There is a direct

causal relationship between Mosseri, Florida, and Louis Vuitton's trademark

claims.  See Helicopteros, 466 U.S. at 414, 104 S. Ct. at 1872.  This first

requirement is easily satisfied.

## C.    Prong Two: Purposeful Availment

In intentional tort cases, there are two applicable tests for determining

whether purposeful availment occurred.  First, we may apply the "effects test,"

which the Supreme Court articulated in Calder v. Jones, 465 U.S. 783, 104 S. Ct.

1482 (1984) (involving libel claims).  Under the "effects test," a nonresident

defendant's single tortious act can establish purposeful availment, without regard

to whether the defendant had any other contacts with the forum state.  See

Lovelady, 544 F.3d at 1285.  This occurs when the tort: "(1) [was] intentional; (2)

[was] aimed at the forum state; and (3) caused harm that the defendant should have

anticipated would be suffered in the forum state."  Id. at 1285–86, 1287–88.  In

Lovelady, this Court concluded the defendant's use of the Florida plaintiff's

33

trademarked name and picture on a website accessible in Florida "satisfied the Calder 'effects test' for personal jurisdiction—the commission of an intentional tort aimed at a specific individual in the forum whose effects were suffered in the forum." Id. at 1288 (concluding due process was satisfied because the plaintiff was a Florida resident and the defendant directed his intentional actions towards the plaintiff in the forum state).

We may also apply a traditional purposeful availment analysis. The same day that the Supreme Court issued its decision in Calder, it also issued an opinion in another intentional tort case (but not one brought by a resident of the forum state). See Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 104 S. Ct. 1473 (1984) (involving libel claims). In that intentional tort case, the Court applied the traditional minimum contacts test. Id. at 1478–79, 104 S. Ct. at 775–77. Circuit courts have applied the traditional minimum contacts test for purposeful availment analysis in lieu of, or in addition to, the "effects test" in cases involving trademark-related intentional torts. See, e.g., Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 172 (2d Cir. 2010) ("Because we have concluded that [the defendant] has purposefully availed himself of the New York forum, we need not decide whether [the defendant's] act of shipping a counterfeit . . . bag represented conduct 'expressly aimed at' New York under the . . . effects test."); Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 454–55 & n.6 (3d Cir. 2003) (analyzing personal

34

jurisdiction under the traditional minimum contacts test and holding that, in the alternative, the alleged infringement did not satisfy the "effects test").

This Court has applied that test, too. See S.E.C. v. Carrillo, 115 F.3d 1540, 1542 (11th Cir. 1997) (applying the traditional minimum contacts test in a case involving intentional tort claims of securities fraud). The "effects test" provides an additional means, unavailable in contract cases, of determining the appropriateness of personal jurisdiction—one that is based on a plaintiff's ties to the forum state and the harm suffered by the plaintiff. The "effects test," however, does not supplant the traditional minimum contacts test for purposeful availment applicable in contract and tort cases alike. Because Louis Vuitton showed purposeful availment under that test, we need not analyze the "effects test" here.[11]

Under the minimum contacts test for purposeful availment, we assess the nonresident defendant's contacts with the forum state and ask whether those contacts: (1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed himself of the privileges of doing business within the forum; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum. See Carrillo, 115 F.3d at 1542. In

---

[11]Oldfield states in dicta in a footnote that the minimum contacts test applies in negligence cases and the "effects test" applies in intentional tort cases. See 558 F.3d at 1220 n.28. Oldfield, however, was a negligence case and did not state the "effects test" is the exclusive test for intentional tort cases. Rather, it stated the "effects test" applies only in intentional tort cases, a proposition with which we do not disagree.

35

performing this analysis, we identify all contacts between a nonresident defendant and a forum state and ask whether, individually or collectively, those contacts satisfy these criteria.  See King & Hatch, Inc. v. S. Pipe & Supply Co., 435 F.2d 43, 46 (5th Cir. 1970) ("Taken collectively, the contacts of [the nonresident defendant] with the State of Alabama far exceed those 'minimum contacts' which would allow Alabama to constitutionally compel [the defendant] to defend this suit in the forum state.").[12]

Based upon the unrebutted allegations of the complaint, the investigators' testimony, and the district court's fact findings, we conclude that Mosseri purposefully availed himself of the Florida forum in such a way that he could reasonably foresee being haled into a Florida court.  Mosseri purposefully solicited business from Florida residents through the use of at least one fully interactive, commercial website, "pendoza.com."  As a result of this Internet advertising, Mosseri received orders from multiple Florida residents to ship goods into Florida. At least one of those orders was from Holmes for a billfold and Mosseri shipped those goods, including the billfold, into Florida.  These collective contacts establish that Mosseri purposefully availed himself of the privileges of doing business in south Florida.

---

[12]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

We are not saying that the mere operation of an interactive website alone gives rise to purposeful availment <u>anywhere</u> the website can be accessed.  <u>See</u> <u>Toys "R" Us</u>, 318 F.3d at 453–54; <u>see also</u> <u>be2 LLC v. Ivanov</u>, 642 F.3d 555, 558–59 (7th Cir. 2011) (concluding that there was insufficient evidence that the defendant, operator of a dating website which made user accounts freely available, purposefully availed himself of doing business in Illinois); <u>Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs, Inc.</u>, 334 F.3d 390, 400–01 (4th Cir. 2003) (concluding that the Illinois defendant's semi-interactive website alone did not create personal jurisdiction in Maryland because the overall content of the defendant's website had a strongly local character emphasizing its "mission to assist <u>Chicago-area</u> women in pregnancy crises").

But we are saying purposeful availment for due process was shown here because, in addition to his fully interactive "pendoza.com" website accessible in Florida, Mosseri had other contacts with Florida—through selling and distributing infringing goods through his website to Florida consumers—<u>and the cause of action here derives directly from those contacts</u>.

## D.    Prong Three: "Fair Play and Substantial Justice"

The exercise of personal jurisdiction over Mosseri in Florida also comports with fair play and substantial justice.  <u>See</u> <u>Int'l Shoe</u>, 326 U.S. at 320, 66 S. Ct. at 160.  In this analysis, we consider these factors: (1) "the burden on the defendant";

37

(2) "the forum's interest in adjudicating the dispute"; (3) "the plaintiff's interest in obtaining convenient and effective relief"; and (4) "the judicial system's interest in resolving the dispute." Lovelady, 544 F.3d at 1288.

Mosseri has not offered any evidence of his finances or any other limitations on him to show that he would be burdened by having to litigate the case in Florida. In light of Mosseri's selling trademark infringing goods into Florida and Louis Vuitton's having multiple stores in Florida, Florida had a strong interest in hearing the case and protecting consumers from confusion that results from trademark infringement. Moreover, Louis Vuitton, as a plaintiff with Florida stores, has an undeniable interest in litigating the case in its chosen forum. The judiciary has an interest in efficiently resolving the dispute in the forum where an extensive record was established and the case was long pending.

It bears noting, too, that Louis Vuitton, while capable of litigating in New York or anywhere else, did not bring this lawsuit in Florida to draw Mosseri away from his home jurisdiction. When Louis Vuitton filed the lawsuit, it did not know who was behind the websites or where the person was. Requiring two lawsuits when one would do makes little sense. Mosseri can constitutionally be sued in Florida; that he could also be sued in New York is quite beside the point.

## VII.  CONCLUSION

38

In sum, under the unrebutted allegations and testimony here, the district court in Florida did not violate the Due Process Clause by exercising personal jurisdiction over Mosseri for Louis Vuitton's trademark infringement claims. Because the state statutory and federal constitutional personal jurisdiction requirements were satisfied, the district court did not err in denying Mosseri's motion to vacate the default judgment.

**AFFIRMED.**