**HARD CANDY, LLC, Plaintiff,**

v.

**HARD CANDY FITNESS, LLC, et al., Defendants.**

**Case No. 13–23705–CIV.**

United States District Court, S.D. Florida.

Signed May 13, 2015.

Kevin C. Kaplan, Gabriel Groisman, Erika Handelson, Coffey Burlington, P.L., for Plaintiff.

Yano Rubinstein, Kymberleigh Korpus, Rubinstein Law, Gail A. McQuilkin, Douglas A. Wolfe, Kozyak Tropin & Throckmorton, LLP, for Defendants.

## ORDER

CECILIA M. ALTONAGA, District Judge.

**THIS CAUSE** came before the Court on Specially Appearing Defendants, MGHCandy, LLC ("MGHCandy"), Guy Oseary ("Oseary"), and Madonna Louise Ciccone's ("Ciccone['s]" or "Madonna['s]") (collectively, the "New Defendants[']") Second Motion to Dismiss for Lack of Personal Jurisdiction, or in the Alternative to Transfer to Northern (or Central) District of California ("Motion") [ECF No. 179], filed February 20, 2015. On March 9, 2015, Plaintiff, Hard Candy, LLC ("Hard Candy"), filed its Sealed Response ... ("Response") [ECF No. 185]. On March 20, 2015, the New Defendants filed a Sealed Reply ... ("Reply") [ECF No. 192]. The Court has carefully reviewed the parties' written submissions and applicable law.

## I. BACKGROUND

In this trademark action, Hard Candy, a company operating in the fashion and beauty industries, challenges the use in commerce of certain trademarks by various businesses and individuals associated with Ciccone, popularly known as the musician Madonna. In the latest iteration of this suit, which has been pending since October 2013, Hard Candy tests the limits of the Court's power to render binding judgments on individuals tenuously connected with the State of Florida.

### A. Hard Candy

Hard Candy, a Florida limited liability company with its principal place of business in Hollywood, Florida, traces its origins to a "Hard Candy" nail polish its predecessor created in 1995. (*See* First Amended Complaint ... ("First Amended Complaint" or "FAC") [ECF No. 85] ¶¶ 1, 12). Around that time, the predecessor filed a U.S. trademark application for the nail polish. (*See id.* ¶ 12). Some time later, the predecessor filed another application under the name "Hard Candy" for cosmetics, including lipstick, lipliner, mascara, and the like. (*See id.*). Since then, Hard Candy and its predecessors have grown into a manufacturer of goods in the fashion and beauty industries, with a target demographic primarily consisting of teenage girls and young female adults. (*See id.* ¶ 11).

Hard Candy's products are sold in the United States in Wal–Mart retail stores and on Wal–Mart's website. (*See id.*). Since 1997, Hard Candy has also operated a website at www.hardcandy.com, on which Hard Candy currently displays its products with a link to Wal–Mart's website. (*See id.* ¶¶ 11, 15). Given the "Hard Candy" products' success at Wal–Mart, Hard Candy "has planned and is in the midst of implementing an extensive launch of *Hard Candy* products at Wal–Mart, including clothing, apparel, furniture, bedding, and more." (*Id.* ¶¶ 22–23 (emphasis in original)). According to Hard Candy, "[t]hrough continuous and exclusive use in commerce, and as a result of extensive marketing, promotion, advertising and sales activity, [its] distinctive *Hard Candy* Marks have achieved widespread renown and recognition by the general public and

have become famous marks." (*Id.* ¶ 25 (emphasis in original; alterations added)).

## B. Hard Candy Fitness

Hard Candy Fitness is a network of luxury fitness clubs operated by Defendant, Hard Candy Fitness, LLC ("HCF"), a Delaware limited liability company with its principal place of business in California. (*See id.* ¶ 2, 32). HCF's clubs are located worldwide, but there has never been a club in Florida. (*See id.* ¶¶ 31–32; Declaration of Guy Oseary . . . ("Oseary Declaration") [ECF No. 180] ¶ 3). HCF is owned by two companies: NEV Hard Candy Fitness, LLC ("NEV–HC") (a Delaware limited liability company) and MGHCandy (a Delaware limited liability company with its principal place of business in California). (*See* HCF Operating Agreement, Ex. AC at 2; FAC ¶ 4).[1] As the Court previously found, NEV–HC is a vehicle through which Defendant, New Evolution Ventures, LLC ("NEV") (a Delaware limited liability company with its principal place of business in California), exercises operational control over HCF. (*See* Sealed Order [ECF No. 84] 2–5; FAC ¶ 3).

MGHCandy, the other owner of HCF, is owned by Ciccone (a resident of New York) and Oseary (a resident of California). (*See* MGHCandy Operating Agreement, Ex. A at 1; FAC ¶ 5; Oseary Decl. ¶ 1).[2] Although Ciccone is MGHCandy's "Managing Member"—vested with "full power and authority to operate and manage [MGHCandy], . . . including without limitation full power and authority with regard to the creative and business decisions under the HCF Operating Agreement"—Oseary, as MGHCandy's "senior management representative," is charged with "conducting [MGHCandy's] day-to-

day business affairs." (MGHCandy Operating Agreement 3, ¶ 2.8(a); *see also* Oseary Decl. ¶¶ 1, 5). Additionally, Oseary and Sara Zambreno ("Zambreno") have provided personal management services to Ciccone since around 2005, first as employees of Guyo Entertainment, Inc. ("Guyo"), and later in affiliation with third-party Live Nation. (*See id.* ¶ 1). Although in some circumstances Oseary and Zambreno must consult with Ciccone before making decisions on her behalf, as a general matter both have considerable discretion to manage Ciccone's affairs without her input. (*See id.*).

In November 2008, NEV filed an intent-to-use application with the U.S. Patent and Trademark Office for use of the mark "Hard Candy Fitness" for "[h]ealth club services, namely providing instruction and equipment in the field of physical exercise for health and physical fitness purposes; instruction in the field of health and physical fitness." (FAC ¶ 26 (alteration added)). The "Hard Candy Fitness" mark was used for the first time over two years later, on November 30, 2010, and was used for the first time in commerce on June 30, 2011. (*See id.* ¶ 29). On October 12, 2011, MGHCandy granted HCF a license to use the mark "Hard Candy Fitness" and any derivatives or developments thereof in connection with the operation of fitness clubs, the sale of related products, and the marketing and promotion of the clubs and products. (*See* License Agreement, Ex. C at Recital E, ¶ 1.1, Schedule A at I–1 to I–2). Later, in May 2014, MGHCandy assigned to HCF its rights in the unregistered mark "Hard Candy" for use on clothing, bags, jewelry, athletic gear, and

---

1. Unless otherwise noted, all citations to exhibits are to the exhibits submitted under seal (without assigned ECF numbers) in support of Hard Candy's Response.

2. Oseary holds his membership interest in MGHCandy via his entity GO MAV, LLC. (*See* MGHCandy Operating Agreement 1, Signature Pages, Schedule I).

accessories sold in the U.S. (*See* Oseary Decl. ¶ 8).

Hard Candy claims the New Defendants "are infringing [Hard Candy]'s *Hard Candy* Marks by, among other things, using the *Hard Candy Fitness* name to promote the fitness clubs, as well as *Hard Candy Fitness* branded apparel, owning and operating their www.hardcandyfitness.com website ..., and selling, marketing and distributing the Hard Candy Fitness DVD," entitled *Addicted to Sweat* (the "ATS DVD"). (Resp. 3 (emphasis in original; alterations added); FAC ¶ 51).

### C. Procedural History

On October 11, 2013, Hard Candy filed a Complaint ... ("Complaint") [ECF No. 1] against HCF and NEV, asserting federal and common law trademark infringement, federal false designation of origin, federal trademark dilution, and common law unfair competition. (*See* Compl. Counts I–V). The Complaint also sought related declaratory judgments and cancellation of NEV's trademark registration. (*See id.* Counts VI–VIII). HCF and NEV responded by filing a motion to dismiss or, in the alternative, to transfer venue to the Northern District of California (*see* Notice of Motion ... [ECF No. 13]), which the Court denied without prejudice so the parties could conduct jurisdictional discovery (*see* Order [ECF No. 20]). Three months later, HCF and NEV filed a second motion to dismiss or transfer venue (*see* Notice of Motion ... [ECF No. 25]), which the Court denied, finding HCF had sufficient contacts with Florida and HCF's contacts were imputed to NEV by virtue of NEV's control over HCF (*see* Order [ECF No. 81]; Sealed Order 2–5).

Before HCF and NEV filed an answer, Hard Candy amended its complaint on May 15, 2014, asserting essentially the same causes of action but naming for the first time MGHCandy, Oseary, and Cic-

cone as defendants alongside HCF and NEV. (*See generally* FAC). On June 2, 2014, HCF and NEV filed an answer [ECF No. 98], which they amended two weeks later (*see* First Amended Answer ... [ECF No. 103]). The New Defendants filed a motion to dismiss or transfer venue to the Northern or Central District of California [ECF No. 109], prompting the Court, on July 9, 2014, to terminate the motion so the parties could conduct another round of jurisdictional discovery, this time to discern what, if any, contacts the New Defendants had with Florida (*see* Order [ECF No. 115]).

After over seven months of jurisdictional discovery, the New Defendants filed the pending Motion, seeking dismissal for lack of personal jurisdiction or, in the alternative, transfer to the Northern or the Central District of California. (*See generally* Mot.).

### II. LEGAL STANDARD

In lieu of filing an answer, a defendant may move to dismiss a claim by asserting lack of personal jurisdiction as a defense. *See* FED. R. CIV. P. 12(b)(2). Because "[f]ederal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons," *Daimler AG v. Bauman*, —— U.S. ——, 134 S.Ct. 746, 753, 187 L.Ed.2d 624 (2014) (alteration added) (citing FED. R. CIV. P. 4(k)(1)(A)), a federal court sitting in Florida must conduct a two-step inquiry to determine whether it has personal jurisdiction over a non-resident defendant: "(1) whether personal jurisdiction exists over the nonresident defendant ... under Florida's long-arm statute, and (2) if so, whether that exercise of jurisdiction would violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir.2013) (altera-

tion added; citation omitted). Under the first prong of the analysis, federal courts must construe the Florida long-arm statute, Florida Statute section 48.193, as would the Florida Supreme Court; absent an indication the Florida Supreme Court would hold otherwise, federal courts are also bound by decisions of the intermediate Florida courts. *See Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir.1996) (citations omitted). Under Florida law, the Florida long-arm statute must be strictly construed. *See id.* (citation omitted).

■■■ Initially, a plaintiff seeking to establish a court's jurisdiction over a nonresident defendant need only allege sufficient material facts to make out a prima facie case of jurisdiction. *See Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir.2000) (citation omitted); *see also Venetian Salami Co. v. Parthenais*, 554 So.2d 499, 502 (Fla. 1989). Once a plaintiff satisfies its initial burden, the burden shifts to the defendant to contradict the plaintiff's allegations by affidavits or other competent evidence. *See Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214–15 (11th Cir.1999). To the extent the defendant's proffered evidence does not contradict the plaintiff's jurisdictional allegations, the allegations must be accepted as true. *See id.* at 1215 (citing *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir.1990)). But to the extent the defendant does contradict the plaintiff's allegations, the burden shifts back to the plaintiff, this time requiring the plaintiff to prove—not merely allege—jurisdiction by affidavits, testimony, or other documents. *See Posner*, 178 F.3d at 1214–15; *Future Tech.*, 218 F.3d at 1249 (citation omitted).

■■■ A party cannot meet its evidentiary burden by submitting affidavits asserting only "conclusory assertions of ultimate fact." *Posner*, 178 F.3d at 1215. Rather, the affidavits must "set forth specific factual declarations within the affiant's personal knowledge." *Id.* In assessing the evidence, the "court must construe all reasonable inferences in favor of the plaintiff." *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 855 (11th Cir.1990) (citations omitted). Only if the evidence cannot be reconciled should the court hold an evidentiary hearing. *See Abramson v. Walt Disney Co.*, 132 Fed. Appx. 273, 275 (11th Cir.2005) (citing *Venetian Salami*, 554 So.2d at 503; *Walt Disney Co. v. Nelson*, 677 So.2d 400, 403 (Fla. 5th DCA 1996)).

## III. ANALYSIS

The New Defendants argue Hard Candy cannot establish the Court has specific or general jurisdiction over them. (*See generally* Mot.). With respect to specific jurisdiction, the New Defendants contend "they are not involved in the transactions and occurrences giving rise to the [First Amended Complaint]." (*Id.* 1 (alteration added)). They also contend they have "little to no contacts with Florida," and therefore Hard Candy cannot establish general jurisdiction. (*Id.*). In the event the Court finds it has jurisdiction over them, the New Defendants argue venue in this District is improper, as venue in either the Northern District of California or the Central District of California would be more convenient and just. (*See id.* 18–20).

In response to the New Defendants' specific jurisdiction argument, Hard Candy asserts the New Defendants' contacts with Florida are no different from HCF and NEV's contacts, given "the New Defendants directed, controlled and engaged in the infringing activities in Florida." (Resp. 2). Hard Candy argues the New Defendants' personal contacts with Florida are sufficient to confer general jurisdiction over them as well. (*See id.*). Finally, Hard Candy challenges the New Defen-

dants' request to transfer venue, arguing they have failed to carry their burden of overriding Hard Candy's choice of venue. (*See id.* 17–18).

## A. Specific Jurisdiction

The Florida long-arm statute recognizes two kinds of personal jurisdiction over a nonresident defendant: specific jurisdiction and general jurisdiction. *See* FLA. STAT. § 48.193. The statute confers specific jurisdiction over a non-resident defendant if the claim asserted against the defendant arises from the defendant's forum-related contacts (*i.e.*, contacts with Florida), and those contacts fall within one of nine statutorily enumerated categories. *See id.* § 48.193(1)(a). The statute expressly provides a defendant's contacts may be based not only on the defendant's personal activities, but also on the actions of the defendant's agents. *See id.* Hard Candy relies on this agency theory of jurisdiction and argues the New Defendants' contacts, considered in conjunction with HCF and NEV's contacts, satisfy two of the statute's specific-jurisdiction categories: (1) "Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state," *id.* § 48.193(1)(a)(1); and (2) "Committing a tortious act within this state," *id.* § 48.193(1)(a)(2). (*See* Resp. 11).

■■ To establish a defendant is "carrying on business" under the Florida long-arm statute, "the activities of the defendant must be considered collectively and show a general course of business activity in the state for pecuniary benefit." *Future Tech.*, 218 F.3d at 1249 (citations omitted). Relevant factors in this analysis include "the presence and operation of an office in Florida ..., the possession and maintenance of a license to do business in Florida ..., the number of Florida clients served ..., and the percentage of overall revenue gleaned from Florida clients."

*Horizon Aggressive Growth, L.P. v. Rothstein–Kass, P.A.,* 421 F.3d 1162, 1167 (11th Cir.2005) (alterations added; citations omitted). Another relevant factor is the defendant's marketing and advertising in Florida. *See Carmel & Co. v. Silverfish, LLC,* No. 1:12–cv–21328–KMM, 2013 WL 1177857, at *3 (S.D.Fla. Mar. 21, 2013) (citing *Sculptchair,* 94 F.3d at 627).

■ As for the second category, "committing a tortious act," a non-resident defendant commits a tortious act within Florida so long as the act causes injury within Florida—even if the defendant committed the act outside the state. *See Louis Vuitton Malletier,* 736 F.3d at 1353 & n. 9 (citations omitted). Further, "[t]he appropriate inquiry is whether the tort as alleged occurred in Florida, and not whether the alleged tort actually occurred." *Machtinger v. Inertial Airline Servs., Inc.,* 937 So.2d 730, 734 (Fla. 3d DCA 2006) (citation omitted; alteration added); *see also Brennan v. Roman Catholic Diocese of Syracuse N.Y., Inc.,* 322 Fed.Appx. 852, 855 (11th Cir.2009) (citing *Future Tech.,* 218 F.3d at 1250).

### 1. Jurisdictional Allegations

The Court turns to the First Amended Complaint, as Hard Candy bears the initial burden of pleading allegations sufficient to establish a prima facie case of specific jurisdiction. Counts I through V of the First Amended Complaint—trademark infringement under 15 U.S.C. § 1114, false designation of origin under 15 U.S.C. § 1125(a), trademark dilution under 15 U.S.C. § 1125(c), common law trademark infringement, and common law unfair competition—involve "tortious acts" under the Florida long-arm statute. *See Louis Vuitton Malletier,* 736 F.3d at 1343, 1353 (citation omitted) (federal trademark infringement and false designation of origin); *Full Sail, Inc. v. Spevack,* No.

603CV887ORL31JGG, 2003 WL 25277185, at *1, 3 (M.D.Fla. Oct. 21, 2003) (citations omitted) (federal trademark dilution); *HSI IP, Inc. v. Champion Window Mfg. & Supply Co.*, 510 F.Supp.2d 948, 954–55 (M.D.Fla.2007) (common law trademark infringement and unfair competition). The parties do not address whether Counts VI through VIII also involve tortious acts under the statute, but given those causes of action are closely linked to the others,[3] the Court assumes without deciding those causes of action involve "tortious acts" under the statute.

▮ Hard Candy alleges: the New Defendants conduct significant business in this District by selling Hard Candy Fitness products and services here, both in stores and via the internet (*see* FAC ¶¶ 4–6); MGHCandy "actively participates in all of HCF's decisions related to the use of the mark 'Hard Candy,' and the aesthetics of the mark and the products" (*id.* ¶ 4); the New Defendants' "tortious conduct is intentionally and purposefully directed at" Hard Candy (*id.* ¶ 9); and the ATS DVD is now being sold across the United States in stores and via the internet, including at Target stores in this District (*see id.* ¶¶ 51–52). Hard Candy further alleges MGHCandy, Ciccone, and Oseary:

> direct, control, ratify, and participate in the infringing activity. [Ciccone] is the driving force behind the infringing activity, taking credit herself for the initial selection and subsequent expansion of the infringing marks. In fact, [MGHCandy, Ciccone,] and Oseary approve and control all aspects of the use of the mark "Hard Candy," including but not limited to the "artistic content," aesthetics and images related to the use of the mark in the United States and abroad. Their approval and control

rights specifically include the Addicted to Sweat DVD—from its creation, sale and marketing, to the content and cover—the locations for new fitness centers, and the scope of "Hard Candy Fitness" branded services and products, including apparel, sunglasses, bags, t-shirts and more.

(*Id.* ¶ 63 (alterations added)). Hard Candy's allegations set forth a prima facie case of specific jurisdiction under the "carrying on a business" and "committing a tortious act" provisions of the long-arm statute. Accordingly, the burden shifts to the New Defendants to submit evidence contradicting Hard Candy's jurisdictional allegations.

**2. Imputing Jurisdictional Contacts**

▮ Hard Candy alleges the New Defendants have both individual contacts with Florida and contacts imputed to them by virtue of their alleged control over HCF. "A fundamental principle of Anglo–American law is that a business operating as a legally recognized entity is separate and distinct from its owners." 114 AM. JUR. PROOF OF FACTS 3d 403 (2015). "Generally," therefore, "a foreign parent corporation is not subject to the jurisdiction of a forum state merely because a subsidiary is doing business there." *Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1272 (11th Cir.2002) (citation omitted). A subsidiary's contacts may, however, be imputed to the foreign parent, and therefore potentially subject the parent to personal jurisdiction, "if the subsidiary is merely an agent through which the parent company conducts business in a particular jurisdiction or [the subsidiary's] separate corporate status is formal only and without any semblance of individual identity." *Id.* (al-

---

**3.** In Counts VI through VIII, Hard Candy seeks declaratory judgments regarding Hard Candy's trademark registrations and the De-

fendants' alleged trademark infringement, as well as cancellation of NEV's trademark registrations.

teration added; citation omitted). This agency theory of personal jurisdiction is "not ... limited to a parent-subsidiary relationship," but rather may extend to other relationships, such as the relationship between members of a limited liability company and the company itself. *Id.* at 1273 (alteration added; citations omitted); *see also* 4A FED. PRACTICE & PROCEDURE § 1069.4 (3d ed.2015).

 Agency-based personal jurisdiction exists where the parent entity exercises operational control over a subsidiary. *See Yellow Pages Photos, Inc. v. Ziplocal, LP,* No. 8:12–cv–755–T–26TBM, 2012 WL 5830590, at *3 (M.D.Fla. Nov. 16, 2012) (citations omitted). "Operational control" means "the day-to-day control of the internal affairs or basic operations of the subsidiary." *Id.* (citing *Enic, PLC v. F.F. South & Co.,* 870 So.2d 888, 891–92 (Fla. 5th DCA 2004)); *see also Faro Techs., Inc. v. Cimcore Corp.,* No. 6:05–CV–1702–ORL–31JGG, 2006 WL 1119223, at *5 (M.D.Fla. Apr. 27, 2006) (citation omitted). "The amount of control exercised by the parent must be high and very significant." *Enic,* 870 So.2d at 891 (citing *State v. Am. Tobacco Co.,* 707 So.2d 851, 855 (Fla. 4th DCA 1998)). Jurisdictional contacts will not be imputed in the absence of such a high degree of control, even when a parent and its subsidiary otherwise have "a very close working relationship" and "regular and extensive contact." *Gen. Cigar Holdings, Inc. v. Altadis, S.A.,* 205 F.Supp.2d 1335, 1343–44 (S.D.Fla.2002), *aff'd* 54 Fed. Appx. 492 (11th Cir.2002).

 Agency-based jurisdiction also exists where the subsidiary has no independent purpose for existence but rather conducts business solely for the parent. *See Meier,* 288 F.3d at 1273. Thus, for the subsidiary to be more than a "mere instrumentalit[y]," it must have "separate corporate interests of its own," meaning it does not "function[ ] solely to achieve the pur-

pose of the dominant corporation." *Id.* (alterations added) (quoting *Am. Tobacco Co.,* 707 So.2d at 855; citing *Universal Caribbean Establishment v. Bard,* 543 So.2d 447, 448 (Fla. 4th DCA 1989)). The fact the parent approves major policy decisions of the subsidiary and establishes the subsidiary's goals and directives is not sufficient to render the subsidiary merely a formality. *See Enic,* 870 So.2d at 891 (citing *Kramer Motors, Inc. v. British Leyland, Ltd.,* 628 F.2d 1175, 1177 (9th Cir.1980), *cert. denied* 449 U.S. 1062, 101 S.Ct. 785, 66 L.Ed.2d 604 (1980)); *Am. Tobacco Co.,* 707 So.2d at 856. Similarly, operational control does not exist simply because the parent monitors the subsidiary and advises it when necessary. *See id.*

In the Court's Sealed Order and during a related hearing, the Court found it had jurisdiction over HCF because HCF''s contacts with Florida showed it purposely directed its marketing efforts and infringing goods into Florida. (*See* Sealed Order 2). Specifically, HCF: published an interview about the ATS DVD in the Florida newspaper the *Palm Beach Post;* hired Miami-based Brandshark as its marketing director and Miami resident Colleen Sparda as chief marketing officer; held a Miami event promoting the ATS DVD; and sold the infringing goods into Florida. (*See id.*). The Court found it could also exercise personal jurisdiction over NEV because NEV, through its subsidiary NEV–HC, exercised operational control over HCF. (*See id.* 2–5). Hard Candy now seeks to expand the Court's prior holding to the New Defendants on the theory the New Defendants also control HCF. (*See* Resp. 12–14).

### 3. The New Defendants' Evidence

 In response to Hard Candy's allegations, the New Defendants offer evidence in support of their arguments that: (1) the New Defendants do not personally

sell or market the ATS DVDs in Florida or otherwise conduct HCF-related business in Florida; (2) the New Defendants do not control HCF, whether generally or specifically with respect to HCF's Florida contacts; and (3) Zambreno's conduct cannot be imputed to the New Defendants because Zambreno acts autonomously in her capacity as a Guyo employee and performs a merely ancillary role in connection with certain HCF marketing and sales decisions.[4] (*See* Mot. 14–16).

To begin, the evidence reflects the New Defendants' role in HCF is much more limited than NEV's role. According to Richard Feldstein, who provides business and accounting services to MGHCandy and Ciccone, MGHCandy was formed for the following purposes: (1) allowing Ciccone and Oseary to hold ownership interests in MGHCandy; (2) fulfilling obligations and receiving benefits pursuant to the HCF Operating Agreement; (3) facilitating the transfer of intellectual property rights to HCF; and (4) engaging in other necessary and incidental activities. (*See* Declaration of Richard Feldstein ... ("Feldstein Declaration") [ECF No. 182] ¶ 3; *see also* MGHCandy Operating Agreement ¶ 2.3).

The limited purposes for which MGHCandy was formed reflect the limited role MGHCandy plays in HCF. The HCF Operating Agreement designates NEV–HC as the "Managing Member," charged with, among other things, "devot[ing] its full time to the development, implementation and management of the Company Business;" "develop[ing] the general design concept for Clubs;" and making "all day-to-day decisions." (HCF Operating Agreement ¶ 6.1(b) (alterations added); *see also id.* ¶ 6.2). The HCF Operating Agreement states HCF "and its business

shall be managed and operated exclusively by the Managing Member," except as otherwise provided. (*Id.* ¶ 6.1(a)). These exceptions are approval rights held by MGHCandy, which give MGHCandy the power, but not the duty, to influence HCF decision-making.

As relevant to this dispute, NEV–HC and MGHCandy share approval rights with respect to "the acquisition or disposition of any material trademark or other intellectual property rights;" "hiring of the Company's Chief Executive Officer, President and/or Chief Marketing Officer;" "any decision to expand the scope of the Company Business beyond licensed Clubs and owned Clubs, or the sale of any Club Products outside of the Clubs;" "the identity of any potential licensee or distributor of any approved Club Products;" "the general artistic 'look and feel' regarding any material renovation of any Club;" and "all material creative decisions, including as to the annual marketing plan and the Club Products." (*Id.* ¶ 6.4(a)). In contrast to shared approval rights, the HCF Operating Agreement further grants MGHCandy exclusive approval rights: "in the event of a disagreement over a creative decision, the decision of MGH[Candy] will control." (*Id.* ¶ 6.4(a)(xxiv) (alteration added)). The HCF Operating Agreement elaborates:

all material creative decisions with respect to the Company (including, without limitation, as to derivatives of the Hard Candy Fitness name, other brand names, trade names, trademarks, trade dress and service marks, and the annual marketing plan and the Club Products) shall be approved by MGH[Candy] and NEV–HC, [and] in the event of any disagreement over a creative decision,

---

4. In its Response, Hard Candy does not address the argument regarding Zambreno. As such, and based on the evidence submitted by

the New Defendants, described *infra,* the Court finds Zambreno's conduct cannot be imputed to the New Defendants.

the decision of MGH[Candy] shall control.

(*Id.* ¶ 6.8 (alterations added)).

Similar approval rights held by MGHCandy are provided for in the License Agreement. Among the matters "subject to Licensor's approval in each instance" are:

> all decisions regarding whether to Exploit any Covered Products, and if Licensor approves the Exploitation of Covered Products, all decisions regarding the selection and array of Covered Products to be offered, whether such Covered Products will be offered for sale solely in the Covered Clubs or also outside of the Covered Clubs, the markets in which the Covered Products will be exploited, the tiers of distribution and positioning of the Covered Products (including all "bricks and mortar" and other retailers through which the Covered Products will be sold), and all agreements with respect to the Exploitation of the Covered Products in the approved markets.

(License Agreement ¶ 5.2(d)). MGHCandy, as Licensor, also must give its approval as to "all other aspects of the Exploitation of the Covered Products and all materials relating thereto." (*Id.* ¶ 5.2(e)).

At the same time, although MGHCandy's approval rights give it the power to prevent HCF from taking certain courses of action, nothing in the HCF Operating Agreement gives MGHCandy the power to make HCF do anything. (*See* Oseary Decl. ¶¶ 5, 7). Rather, NEV–HC alone holds the power to cause HCF to affirmatively act. (*Id.*). Thus, under the HCF Operating Agreement, NEV–HC has wide latitude to conduct HCF's business affairs, but MGHCandy has the power, if it chooses to exercise it, to veto more fundamental intellectual property and creative decisions. This asymmetrical division of power aligns with the parties' skills and interests: as Oseary recognizes, "NEV has [the] expertise needed to grow and operate a luxury fitness club business and brand," whereas MGHCandy has purported intellectual property rights and a broader artistic image (*i.e.*, Madonna) that may be leveraged for profit. (*Id.* ¶ 6 (alteration added)).

Yet the parties' agreements are not the be-all-end-all of the jurisdictional inquiry. In fact, the evidence shows the delegation of rights under the agreements does not reflect the parties' actual course of conduct. Significantly, the evidence shows the New Defendants exercised their approval rights sparingly and only with respect to general, high-level creative matters. Even more significantly, there is no evidence the New Defendants exercised their approval rights with respect to Florida in particular.

As Oseary explains it, MGHCandy has "high-level approval rights" (*id.* ¶ 5), and "does not actively participate in each and every HCF decision[ ] related to its use of its HARD CANDY and HARD CANDY FITNESS marks" (*id.* ¶ 6 (emphasis in original; alteration added)). Rather, "NEV runs the day-to-day operation of HCF, making most decisions on its own and typically only getting MGHCandy involved when threshold creative or aesthetic issues relating to the HCF clubs and products need to be resolved." (*Id.* (emphasis omitted)). Oseary elaborates the parties treat the approval rights as "a mere courtesy (rather than a strict operational requirement)." (*Id.*). The purpose of the approval rights is "to empower MGHCandy to manage the integrity of its investment in HCF (should it prove necessary), and to enable MGHCandy to put a halt to any HCF conduct which undermined MGHCandy's and/or its members' trademark rights." (*Id.*). Yet, according to Oseary, MGHCandy has never had to

enforce its interests under such circumstances given its satisfaction with HCF's performance. (*See id.*). As a result, MGHCandy has "allowed HCF to move things forward as they [sic] see fit." (*Id.*).

This is not to say MGHCandy has not been involved with HCF, but the level of involvement is limited compared to the operational control exerted by NEV. MGHCandy has approved "creative choices made by HCF in connection with HCF-related goods, services, and clubs (*e.g.*, selection of images, graphics, colors, themes, venues, and word choice)." (*Id.* ¶ 7 (emphasis omitted)). MGHCandy has also approved the creative aspects of content posted to the internet by HCF, such as "the format of the post (*i.e.*[,] contest or other announcement or comment), and the images, graphics, colors, [and] word choices used in the post to convey HCF's message." (*Id.* (alterations added)). But despite being involved with some aspects of internet content, neither Ciccone nor Oseary has reviewed the websites through which Hard Candy products are sold. (*See* Sept. 18, 2014 Deposition of Guy Oseary ("Oseary Dep.") Ex. B at 52:1–17).

As another example cited by the New Defendants, in March 2012, HCF obtained MGHCandy's general approval to create and distribute the ATS DVD. (*See* Oseary Decl. ¶ 6; Declaration of Sara Zambreno Turner ... ("Zambreno Declaration") [ECF No. 181] ¶ 6). In the ensuing approval process, Ciccone provided input regarding: "(1) the individual names used for the DVDs in the set; (2) the DVD descriptions included on the back of the DVD covers; (3) the wording of the quote attributed to Ciccone on the cover of the DVDs; and (4) the title that should be given to the dancer in the DVD, Nicole Winhoffer ('Winhoffer')." (*Id.*). Ciccone also selected the final DVD cover artwork based on a few options with which she was presented, as well as the final color scheme

and layout (including images) for the rest of the DVD artwork. (*See id.*). According to Zambreno, "[a]lthough the Hard Candy Fitness name and logos appeared on the proof sheets ..., there was no discussion with HCF regarding HCF's use thereof." (*Id.* (alterations added)). Ciccone also viewed a "sizzle reel" highlighting portions of the DVD's content, but she never viewed the entire DVD. (*See id.*). Ciccone gave "MGHCandy's final aesthetic approval for the appearance of the completed DVD on or about August 8, 2012." (*Id.*). According to Ciccone, she was "only concerned with [her own] image on the cover of the DVD," and she did not otherwise take part in any approval process regarding how the DVD was advertised, presented, or sold. (Feb. 12, 2015 Deposition of Madonna L. Ciccone ("Ciccone Dep.") Ex. D at 46:7–15 (alteration added)).

The evidence submitted by the New Defendants also shows the New Defendants' communications among themselves and with others on HCF-related matters occurred infrequently and concerned high-level topics. Substantive communications between HCF and MGHCandy typically took place through e-mails or telephone calls between Brent Leffel, the President of HCF, and Oseary. (*See* Oseary Decl. ¶ 6). NEV provides MGHCandy periodic updates, usually in the form of e-mails to Oseary, regarding "HCF's strategic direction and performance" as to its clubs, services, and products. (*Id.*). The updates are not "detailed plans that require MGHCandy approval" but rather are "conceptual updates as to what is being considered and planned at a high level." (*Id.*). As Oseary explained in his deposition, he meets with Leffel "sometimes every month, sometimes every few months ... [to] brainstorm[ ] on creative ideas." (Oseary Dep. 104:24–105:9 (alterations added)). Similarly, Oseary and Ciccone "rarely exchange e-mails regarding" HCF.

(*Id.* 31:22–23). HCF has sent only one marketing plan to MGHCandy for its approval (*see* Oseary Decl. ¶ 6), despite the contractual requirement it do so annually (*see* HCF Operating Agreement ¶ 6.8).

As for Ciccone, Zambreno is her "day-to-day manager" (Ciccone Dep. 27:15–28:3), and in that capacity Zambreno "regularly act[s] as a conduit through which information is passed between Ciccone and other persons," including representatives of HCF and NEV with respect to HCF-related matters (Zambreno Decl. ¶ 1 (alteration added)). According to Zambreno, all communications from HCF personnel to Ciccone go through Zambreno (*see* Sept. 19, 2014 Deposition of Sara Zambreno ("Zambreno Dep.") Ex. AD at 205:5–7), and those communications concern either creative decisions or logistical issues such as personal appearances Ciccone makes at HCF clubs (*see* Zambreno Decl. ¶ 4). The record does reflect, however, Ciccone had two substantive meetings with HCF regarding the gyms' aesthetics and the kinds of training offered: a 45–minute teleconference with Leffel and a 90–minute in-person meeting with Leffel, both of which took place in 2013. (*See* Oseary Decl. ¶ 6; Ciccone Dep. 63:5–25; 79:8–9). Although Zambreno meets with Ciccone daily, Zambreno estimates they discuss HCF-related matters "[m]aybe once every couple of months." (Zambreno Dep. 204:8–24 (alteration added)). When they do discuss HCF-related matters, the issues are "more aesthetic, approving a color of something in a gym, approving flooring." (*Id.* 24:3–8). Indeed, Ciccone approved certain HCF merchandise, including shirts, sunglasses, water bottles, a gym bag, and a pen. (*See id.* 132:6–15; Exs. AE, AF).

With respect to press and media more generally, Zambreno works with Liz Rosenberg, a press agent hired by Live Nation, to ensure HCF's marketing efforts do not "reflect[ ] negatively on Ciccone."

(Zambreno Decl. ¶ 7 (alteration added)). Despite Zambreno's oversight, she does not bring any marketing issues to Ciccone's attention "unless her express approval for a quote, image, footage, aesthetic opinion or scheduling issue is required." (*Id.*). In February 2013, Zambreno assisted with HCF's "re-release" of the ATS DVD by introducing HCF to third-parties who could market and distribute the DVD. (*See id.* ¶ 11). Zambreno also oversaw the re-release to ensure no promotional materials reflected negatively on Ciccone. (*See id.*). Zambreno again did not seek or obtain Ciccone's approval during this process. (*See id.*). As Zambreno testified, Ciccone does not instruct HCF as to "how to conduct its business," nor does Ciccone have anything to do with HCF operations. (Zambreno Dep. 205:10–19).

The New Defendants also address Ciccone's concert performances in Florida. In 2012 and 2013, Live Nation and one of Ciccone's business entities collaborated to produce a worldwide concert tour. (*See* Zambreno Decl. ¶ 3). As part of the arrangement, Live Nation—not Ciccone—scheduled and produced the concerts and manufactured and sold merchandise with the "Hard Candy" mark. (*See id.*). Ciccone's obligation was to perform at the concerts, and one of her business entities received compensation for the performances. (*See id.*; Feldstein Decl. ¶ 5). In late November 2012, Ciccone performed two of those concerts in Miami, Florida, but she did not promote HCF or HCF-related goods or services at her concerts, nor did she attend a special event held in Miami around the time of her concerts to promote the ATS DVD. (Oseary Decl. ¶ 4). In fact, the evidence shows Ciccone has not directly sold concert tickets or merchandise in connection with the concerts she has performed with Live Nation over the past five years. (*See id.*).

Finally, affidavits submitted in support of the Motion state the New Defendants have never in the last five years distributed HCF-related promotional materials or engaged in HCF-related solicitation activities in or directed to Florida; owned or operated any website or social media page promoting HCF-related goods or services; manufactured or marketed any HCF-related goods or services in the United States, whether online or in stores; had any dealings with entities that took part in the manufacture, marketing, sale, or distribution of the ATS DVD; or participated in the hiring of, or purposefully worked with, any Florida-based HCF employee or contractor regarding efforts to market or distribute the ATS DVD. (*See id.* ¶ 3; Feldstein Decl. ¶ 4; Zambreno Decl. ¶ 2). Further, "MGHCandy has not received any Florida-based income from HCF, meaning it has not received any income from HCF in connection with the sales … of HCF merchandise in Florida." (Feldstein Decl. ¶ 9 (alteration added)). Additionally, none of the New Defendants has been involved in HCF's trademark management decisions or trademark prosecution efforts, nor has HCF sought approval from any of the New Defendants for its positions or conduct in this litigation. (*See* Oseary Decl. ¶ 8).

In sum, the evidence supports the New Defendants' arguments that: (1) the New Defendants do not personally sell or market the ATS DVDs in Florida or otherwise conduct HCF-related business in Florida; (2) the New Defendants do not control HCF, whether generally or specifically with respect to HCF's Florida contacts; and (3) Zambreno's conduct cannot be imputed to the New Defendants. Because these evidentiary showings contradict Hard Candy's allegations, the burden shifts to Hard Candy to submit evidence proving the New Defendants have the requisite jurisdictional contacts.

### 4. Hard Candy's Response

In its Response, Hard Candy argues the New Defendants are subject to specific jurisdiction in Florida because they engaged in business in Florida and committed tortious acts in Florida. (*See* Resp. 4–6, 11–12). Hard Candy also contends the New Defendants controlled HCF's Florida-related conduct, and therefore HCF's Florida-related contacts should be imputed to the New Defendants. (*See id.* 6–9, 12–14).

First, Hard Candy points to the fact HCF hired Brandshark and Colleen Sparda, both based out of Miami, to lead HCF's marketing efforts. (*See id.* 11). Hard Candy argues this alone makes jurisdiction proper over the New Defendants because MGHCandy "had the authority to disapprove this decision, but chose not to." (*Id.* 11–12). The Court disagrees. It is not enough this decision, or any other HCF decision with respect to Florida, was "within the approval power of the New Defendants" (*id.* 12), when Hard Candy does not rebut evidence showing:

HCF has never asked MGHCandy to approve: (1) any purposeful interjection of HCF goods or services into the state of Florida; (2) any purposeful marketing of HCF goods or services to residents of the state of Florida; (3) the publication of any interviews about the *Addicted to Sweat* DVD in Florida; (4) any decision to try to sell *Addicted to Sweat* DVDs in Florida or to residents of Florida; (5) any decision to hire a Florida-based marketing firm to act as HCF's marketing director; or (6) any decision to hire a Florida resident as HCF's Chief Marketing Officer.

(Oseary Decl. ¶ 7; *see also* Zambreno Decl. ¶ 4).

Next, Hard Candy argues Ciccone instructed HCF to use Winhoffer in press interviews (*see* Resp. 8), but the evidence

cited in support shows only that Ciccone allowed HCF to use Winhoffer in interviews (*see* Ex. AM). It is true that, in giving this approval, Ciccone limited the topics that could be addressed in the interviews, but Ciccone's limitations prohibited discussion of anything not directly related to HCF, such as energy drinks—Ciccone was not directing the interview content regarding HCF. (*See id.*). Further, Ciccone stated in the event the interviews could not be tailored, the interviews should not take place at all. (*See id.*). The evidence therefore does not show Ciccone was directing interviews to take place; rather, she allowed them to take place under specified conditions.

Hard Candy also suggests Ciccone's general permission for Winhoffer to do HCF interviews is the particular reason why the *Palm Beach Post's* interview with Winhoffer took place. (*See* Resp. 12). Even construing the evidence in favor of Hard Candy, that causal link is too tenuous, especially when Hard Candy has submitted no evidence tying Ciccone to that interview in particular. To the contrary, in her deposition, Ciccone admitted she knew Winhoffer did interviews regarding HCF, but Ciccone "couldn't say specifically when and where." (Ciccone Dep. 41:3–5). Ciccone also could not recall any request to arrange Winhoffer's interview with the *Palm Beach Post*, nor could Ciccone recall whether she read the related article. (*See id.* 53:8–55:19).

Hard Candy nevertheless contends Ciccone must have approved the *Palm Beach Post* article because Ciccone "must approve any press release for HCF containing a quote from Madonna or even mentioning Madonna's name." (Resp. 8). In her deposition, Zambreno stated, to her knowledge, no HCF press releases with Madonna quotes have been run without Ciccone's approval. (*See* Zambreno Dep. 38:23–39:1). But Zambreno did not state any press release merely mentioning Ciccone's name must have Ciccone's approval, nor has Hard Candy offered any evidence to this effect. Indeed, the *Palm Beach Post* article, while mentioning Madonna, does not include any quotes attributed to her. (*See* Ex. X). The evidence therefore does not support a finding Ciccone approved the *Palm Beach Post* article.

Additionally, Hard Candy points to the fact the New Defendants gave approval for HCF to sell the ATS DVD, including in Target stores. (*See* Resp. 12). It is true Oseary approved the sale of the DVD in Target stores (*see* Ex. AP), and also testified he would assume anything being offered for sale would be offered for sale online (*see* Oseary Dep. 55:3–10). But the evidence Hard Candy cites does not support the conclusion Oseary approved their sale in Florida specifically. It is also true Ciccone, in addition to Oseary, was advised the DVD was being sold in Target stores throughout the United States (*see* Ex. BI), but Hard Candy offers no evidence showing Ciccone directed the DVD be sold in Target or anywhere, much less specifically in Florida. General approval does not equate to approval specifically with respect to Florida, which is what Hard Candy must show to prove the New Defendants have the requisite contacts.

Hard Candy also argues promotional discount cards for the ATS DVD were approved by Ciccone and then distributed at Madonna concerts in Florida. (*See* Resp. 5, 8, 12). Ciccone, however, testified she neither approved the cards nor was aware the cards were being handed out at her concerts. (*See* Ciccone Dep. 64:22–65:2). Hard Candy proffers an e-mail as support for its argument Ciccone specifically approved the postcards, but the e-mail, while indicating the postcards were approved, does not indicate who approved them. (*See* Resp. 5 (citing Ex. P); *see*

*also* Resp. 8 (citing Ex. AO)). Even drawing the inference Ciccone approved the cards, the email does not indicate they were to be distributed specifically in Florida or to Florida residents. (*See* Exs. P, AO). Hard Candy also attempts to tie Ciccone to the event held in Miami around the time of the Madonna concerts, at which the ATS DVD was promoted (*see* Resp. 5), but as explained, Ciccone did not attend the event.

Hard Candy next asserts Ciccone "personally promoted HCF on her Instagram account" (*id.* 8), but the excerpt from Zambreno's deposition transcript—the only evidence Plaintiff cites in support of this argument—says only there were a few times when HCF asked Ciccone to post something about HCF to her personal Instagram account. (*See* Zambreno Dep. 147:11–16). It does not say Ciccone actually posted anything about HCF to her account. Furthermore, neither she nor Zambreno acting on her behalf has promoted or sold HCF-related goods or services via the internet or in stores. (*See* Zambreno Decl. ¶ 2).[5]

Hard Candy further argues some of the instances, described *supra*, when Ciccone or Oseary gave high-level approvals as to creative decisions, establish the New Defendants' control over HCF. (*See* Resp. 7–9, 11–14). But those actions show only that, to the extent the New Defendants exercise approval rights, they do so sparingly and generally, not anywhere near NEV's level of day-to-day operational control over HCF. Other examples cited by Hard Candy fail for the same reason. According to Hard Candy, Ciccone "was personally involved in certain HCF promotional events, such [as] an appearance on the Ellen show and Good Morning America." (*Id.* 8 (alteration added)). Ciccone recalls appearing on "The Ellen De-

Generes Show," but she does not recall there being a give-away of the ATS DVD in connection with her appearance. (*See* Ciccone Dep. 72:18–73:1). Other evidence corroborates this testimony: Zambreno explains she invited HCF to participate in the give-away, in response to which HCF contributed the ATS DVDs, but Zambreno did not seek or obtain approval from Ciccone to do this. (*See* Zambreno Decl. ¶ 10). Significantly, the "studio-audience give-away occurred after Ciccone had concluded her appearance, and Ciccone never discussed the DVD during the show." (*Id.*). As for "Good Morning America," Ciccone gave approval for her trainers to attend the show and perform a live workout, but Ciccone herself did not attend the show. (*See* Zambreno Dep. 143:1–10).

To bolster its arguments, Hard Candy cites several cases (*see* Resp. 13–14), all of which fall short of establishing the New Defendants' attenuated contacts with Florida are sufficient to subject them to personal jurisdiction in this forum. In *Breckenridge Pharmaceutical, Inc. v. Metabolite Laboratories, Inc.,* the Federal Circuit affirmed the district court's holding the "tortious act" provision of the Florida long-arm statute was not satisfied but the "engaged in solicitation" provision was. *See* 444 F.3d 1356, 1361 (Fed.Cir.2006). Hard Candy does not argue the New Defendants are subject to jurisdiction under the "engaged in solicitation" provision that prevailed in *Breckenridge Pharmaceutical,* but rather the "tortious act" provision that did not prevail.

Next, because the court in *Breckenridge Pharmaceutical* addressed patent claims along with non-patent claims intimately linked with patent claims, the court applied "Federal Circuit law regarding due process," which is not binding in the instant

---

**5.** The HCF website is owned and operated by HCF, and the ATS DVD's website is also owned by HCF. (*See* Declaration of Eric Reiter ... [ECF No. 13–2] ¶¶ 4, 7).

case because no patent claims are asserted. *Id.* at 1361–62. Under the due process analysis, the court found a licensor purposefully availed itself of conducting business in Florida in large part because the licensor and its exclusive licensee worked together in sending cease and desist letters and litigating patent infringement claims in Florida, where they were represented jointly by counsel. *See id.* at 1367. The New Defendants do not have such a close relationship with HCF, and thus even assuming Federal Circuit precedent governed this dispute, *Breckenridge Pharmaceutical* is factually inapposite.

Hard Candy thus mischaracterizes *Breckenridge Pharmaceutical* as a case turning on the relevance of approval rights under the Florida long-arm statute. (*See* Resp. 13). The court did, of course, refer to approval rights, stating "our case law requires that the license agreement contemplate a relationship beyond royalty or cross-licensing payment, such as granting both parties the right to litigate infringement cases or granting the licensor the right to exercise control over the licensee's sales or marketing activities." *Breckenridge Pharm.,* 444 F.3d at 1366. But as just explained, the court's holding was driven by the licensor and licensee's collaboration in patent prosecution. The New Defendants do not control HCF's sales or marketing, neither under the terms of their agreements nor in their actual course of conduct. *See Krauser v. Evollution IP Holdings, Inc.,* 975 F.Supp.2d 1247, 1265–66 (S.D.Fla.2013) (rejecting similar reliance on *Breckenridge Pharmaceutical* ).

Hard Candy's reliance on *Fuel Freedom International, LLC v. Maxma, L.C.,* is likewise misplaced. In that case, the court found a sufficient degree of control by a patentholder and its licensee over their distributor to impute jurisdictional contacts under the "carrying on a business" and "committing a tortious act" provisions of the Florida long-arm statute. *See Fuel Freedom Int'l, LLC v. Maxma, L.C.,* No. 6:06–CV–488–ORL–31DAB, 2006 WL 2734313, at *3–4 (M.D.Fla. Sept. 25, 2006). The court found "most important[ ]" the fact the licensee controlled the distributor's marketing efforts by requiring the distributor to obtain prior approval for any representations it would make regarding the relevant products. *Id.* at *4 (alteration added). That requirement plainly is not present in this case.[6]

The record thus contradicts not only Hard Candy's allegations the New Defendants controlled HCF, but also the allegations the New Defendants personally carried on HCF-related business in Florida and participated in the allegedly infringing activities in Florida. The evidence confirms the New Defendants' contention "MGHCandy is largely a passive investor trying to help HCF develop clubs Ciccone is comfortable being associated with while also staying out of NEV's way—because NEV knows what it is doing." (Mot. 15). Moreover, to the extent the New Defendants participated in decision-making, the actions were not purposely directed to Florida or Florida residents. Strictly construing the Florida long-arm statute, and making all reasonable inferences in favor of Hard Candy, the Court finds the New Defendants' Florida contacts relating to the asserted causes of action are too tenu-

---

**6.** Hard Candy also cites *Babbit Electronics, Inc. v. Dynascan Corp.,* 38 F.3d 1161 (11th Cir.1994), and *Microsoft Corp. v. Silver Star Micro, Inc.,* No. 1:06–cv–1350–WSD, 2008 WL 115006 (N.D.Ga. Jan. 9, 2008), in support of its specific jurisdiction argument (*see* Resp. 13–14), but those cases do not address personal jurisdiction. Rather, they address liability of corporate officers who direct, control, ratify, or participate in trademark infringing activity, an issue not presently before the Court. *See Babbit Elecs.,* 38 F.3d at 1183–84; *Microsoft Corp.,* 2008 WL 115006, at *8.

ous to support specific jurisdiction over the New Defendants.[7]

### B. General Jurisdiction

 The second type of jurisdiction, general jurisdiction, exists over a non-resident defendant "who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise." FLA. STAT. § 48.193(2). Unlike specific jurisdiction, general jurisdiction can be established over a defendant regardless of whether the claim asserted against the defendant arises from the defendant's jurisdictional contacts. *See Woods v. Nova Cos. Belize Ltd.*, 739 So.2d 617, 620 (Fla. 4th DCA 1999) (citations omitted). Despite the absence of express statutory language regarding agency-based jurisdiction, Florida courts impute an agent's general jurisdictional contacts to the agent's principal. *See Meier*, 288 F.3d at 1269–71 (citing *Universal Caribbean*, 543 So.2d at 448).

 The reach of general jurisdiction under the Florida long-arm statute "extends to the limits on personal jurisdiction imposed by the Due Process Clause of the Fourteenth Amendment.... With respect to general jurisdiction under Florida's long-arm statute, therefore, we need only determine whether the district court's exercise of jurisdiction over [the New Defendants] would exceed constitutional bounds." *Fraser v. Smith*, 594 F.3d 842, 846 (11th Cir.2010) (alterations added) (citing *Woods*, 739 So.2d at 620). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, — U.S. ——, 131 S.Ct. 2846,

2853–54, 180 L.Ed.2d 796 (2011) (citation omitted). Corporations are considered "at home" in their place of incorporation and principal place of business. *See Daimler*, 134 S.Ct. at 760 (citations omitted). Corporations may be subject to the exercise of general jurisdiction in other places as well, but the Due Process Clause imposes a high standard: "the inquiry ... is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's 'affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State.' " *Id.* at 760–61 (quoting *Goodyear*, 131 S.Ct. at 2851) (alteration added); *see also id.* at 761 n. 19. In other words, "all-purpose jurisdiction" may be exercised only when "the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit ... *on causes of action arising from dealings entirely distinct from those activities.*" *Id.* at 761 (alterations and emphasis in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

 Hard Candy alleges the New Defendants' activities in Florida "are substantial and not isolated." (FAC ¶ 9). The New Defendants contend the contrary and submit evidence in support. (*See* Mot. 6, 10, 16; Reply 2). With respect to Ciccone, she owned a home in Florida from 1994 until 2000. (*See* Ciccone Dep. 22:24–25). For less than two years during that time span, she was a business partner in the Blue Door restaurant at the Delano hotel in Miami Beach. (*See id.* 23:1–17). Other than the Blue Door, Ciccone has never had an interest in any business in Florida, nor has she done business with any Florida residents. (*See id.* 82:6–83:6). Over the

---

7. Because there is no specific jurisdiction under the long-arm statute, the Court does not

need to determine whether exercising specific jurisdiction would comport with due process.

past five years, Ciccone has traveled to Florida for "a couple" of performances and one personal trip. (Zambreno Dep. 154:10–25). The percentage of Ciccone's income received from performances in Florida since 2009 is 2.3% of her total performance income during that time period. (*See* Feldstein Decl. ¶ 8).

As for Oseary, over the last five years, he has been in Florida for Ciccone's performances and a few other times while passing through to other locations. (*See* Oseary Dep. 19:10–22:09). These visits lasted "for a few days at a time at most." (Oseary Decl. ¶ 10). For one of those visits, in 2012, Oseary arranged with the managers of the Ultra Music Festival in Florida for Ciccone to give a surprise performance, for which she was not compensated. (*See* Oseary Dep. 68:03–69:6). In his declaration, Oseary states he does "not have any clients in Florida;" he does "not have regular business communications with anyone in Florida;" and, since 2009, the total percentage of his income gleaned from clients in Florida is less than 1.5% of his overall income, "and that [Florida] income was received from a single client [he] managed informally during a short period in 2007." (Oseary Decl. ¶ 10 (alterations added)).

Finally, the New Defendants contend:

At no time during the last five years have any of the New Defendants: (1) applied for or been granted a license to conduct business in Florida; (2) registered with the Florida Secretary of State to do business in Florida; (3) purchased, owned or leased any real property in Florida; (4) filed tax returns with the [S]tate of Florida; (5) borrowed any money in Florida or held a mortgage or other lien on any real property in Florida; (6) insured any person and/or property for any activity in Florida; (7) opened or maintained any offices, mailing addresses, telephone numbers, bank accounts, or officers in Florida; (8) hired or otherwise employed any company, contractor, consultant, or person located in Florida to provide them with any business services; (9) entered into any contract with any person or entity residing in Florida; [or] (10) entered into any contract requiring any person or entity to perform any act in Florida.

(*Id.* ¶ 3 (alterations added)).

In response, Hard Candy points to the fact Oseary is a 50/50 owner with Ciccone in a company selling a line of clothing known as "Material Girl," whose products are sold in Macy's stores (*see* Oseary Dep. 78:6–79:14), but Hard Candy offers no evidence those products were sold in Florida. (*See* Resp. 10). Hard Candy also points to the three concerts Ciccone has performed in Florida since 2008 and the almost $4 million in revenue she (or an entity she owned in whole or in part) earned in connection with those concerts. (*See id.* 9–10 (citing Ex. AZ)). Hard Candy argues Ciccone herself sold merchandise at the concerts (*see* Resp. 9), but the evidence indicates third-parties sold the merchandise, not Ciccone. (*See* Exs. AR, AT). Indeed, Feldstein testified Live Nation—not Ciccone—sold Madonna merchandise at two Madonna concerts in Miami in 2012. (*See* Resp. 9 (citing Sept. 19, 2014 Deposition of Richard Feldstein, Ex. AY at 50:11–16)). Other evidence shows Ciccone received royalties from goods sold in Florida, both at concerts and elsewhere, in the amount of $269,584.83 since 2008. (*See* Ex. BA). As for other purported jurisdictional contacts, Hard Candy cites the same evidence the New Defendants cite but characterizes the evidence as more substantial than the New Defendants characterize it. (*See* Resp. 9–10, 14–16).

Considering the evidence as to each of the New Defendants, and drawing all rea-

sonable inferences in favor of Hard Candy, the Court finds the New Defendants' contacts do not confer general jurisdiction under the Florida long-arm statute. The New Defendants are not incorporated in Florida, they are not residents of Florida, and they do not have principal places of business here. Furthermore, their " 'affiliations with the State are [not] so 'continuous and systematic' as to render [them] essentially at home in the forum State.' " *Daimler*, 134 S.Ct. at 760–61 (quoting *Goodyear*, 131 S.Ct. at 2851) (alterations added).[8] The Court again finds the New Defendants do not control HCF, and therefore HCF's contacts cannot be imputed to the New Defendants for purposes of general jurisdiction.[9]

## IV. CONCLUSION

For the foregoing reasons, the New Defendants have carried their burden of proving the Court lacks personal jurisdiction over them. And because the New Defendants are dismissed from the case, their request to transfer venue is now moot. It is therefore

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss ... [ECF No. 14] is **GRANTED in part.** Defendants, MGHCandy, LLC, Guy Oseary, and Madonna Louise Ciccone are **DISMISSED**

from this action. The request to transfer this case to a different venue is **DENIED.**

8. The Supreme Court's recent decisions in *Goodyear* and *Daimler* reinvigorated an otherwise dormant and sparse line of Supreme Court precedent on general jurisdiction. *See Goodyear*, 131 S.Ct. at 2854. This raises the question, unaddressed by the parties, whether those decisions have any bearing on Florida courts' construction of the general jurisdiction provision of the Florida long-arm statute. *See Fraser*, 594 F.3d at 846 (explaining general jurisdiction under the Florida long-arm statute "extends to the limits on personal jurisdiction imposed by the Due Process Clause of the Fourteenth Amendment" (citation omitted)). The Court was unable to find a Florida court decision applying *Daimler*, but the Court was able to find one case applying *Goodyear*, although it provides little guidance. *See Universal Music Venezuela, S.A. v. Montaner*, 105 So.3d 588, 589–90 (Fla. 3d DCA 2012). To the extent the Florida long-arm statute's general jurisdiction provision no longer aligns with the Fourteenth Amendment's Due Process Clause, as clarified in *Daimler* and *Goodyear*, exercising general jurisdiction over the New Defendants is still improper under the Florida long-arm statute. *See Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318–19 (11th Cir.2006).

9. Careful consideration shows the evidence is not in conflict. Hard Candy's request for an evidentiary hearing is therefore denied.